Wachtler, J.
Petitioner, an owner of real property located on Fire Island, claims that the entire assessment roll for the Town of Islip is void. The argument has been raised in a proceeding instituted pursuant to article 7 of the Real Property Tax Law which permits court review of an assessment upon a complaint of illegality, overvaluation or inequality (see Real Property Tax Law, § 706). There is no claim of overvaluation or unequal treatment in the assessment of petitioner’s property. She argues only that the assessments are illegal because they were not made in accordance with section 306 of the Real Property Tax Law which states: "All real property in each assessing unit shall be assessed at the full value thereof.” This, we have held, means market value, unless that cannot be established "and then other tests of full value must be used.” (People ex rel. Parklin Operating Corp. v Miller, 287 NY 126, 129.) Here it is conceded that all assessments throughout the township are based on a percentage of market value.
The Supreme Court, Suffolk County, in an opinion, dismissed the petition. The Appellate Division, Second Department, affirmed, without opinion. Justices Hopkins and Lat-ham concurred on constraint of McAlevey v Williams (41 AD2d 971) but cited cases from other States in which the highest court has held that "full value”, or similar language, prohibits fractional assessments. The case has come to our court by leave of the Appellate Division.
Section 306 of the Real Property Tax Law has an ancient lineage. In 1788 the New York Legislature directed "the *4 assessors of each respective city, town and place in every county of this State [to] make out a true and exact list of the names of all the freeholders and inhabitants and opposite the name of every such person shall set down the real value of all his or her whole estate real and personal as near as they can discover the same”. (See L 1788, ch 65, March 7, 1788.) In 1801 the standard was changed to "just and true value” (L 1801, ch 179, § 1, April 8, 1801) and in 1823 was altered again to read as follows: "all real and personal property shall be valued by the assessors for the purpose of taxation, at the value they would appraise such estate in payment of a bona fide debt due from a solvent debtor”. (L 1823, ch 262 § V, "All property to be assessed at its cash value.”) The term "full value” first appeared in a draft revision of 1826-1828 providing that "All real and personal estate liable to taxation, the value of which shall not have been specified by affidavit of the person taxed, shall be estimated by the assessor at its full value, as they would themselves be willing to receive the same in payment of a just debt due from a solvent debtor; but in the valuation of real estate, the term, 'solvent debtor,’ shall be construed to mean a debtor who is capable of paying all his debts, without resort to the land to be valued.” (Report of the Commissioners to Revise the Statute Laws of 1826-1828, ch XIII, tit II, art 2, § 16, "Of the manner in which assessments are to be made”.) This proposal was enacted into law in 1829 after the Legislature deleted the last clause beginning with the words "but in the valuation of real estate” (NY Rev Stat 1829, vol I, ch XIII, § 17, p 393; see, also, L 1896, ch 908, § 21, subd 3; Cons Laws of 1909, ch 62; L 1933, ch 470, § 18).
Although the statute is one of the oldest in the State there does not appear to be any extant legislative history indicating what the full value requirement was intended to accomplish. And despite the fact that the custom of fractional assessments appears to be at least as old as the statute (see Kilmer, Legal Requirements for Equality in Tax Assessments, 25 Albany L Rev, 203, 210), it has prompted very little litigation. In several of the older cases the problem can be seen lurking in the background; but it is only during the last 10 years that we find the practice being directly challenged in the courts.
It appears the first case touching this point surfaced in our court in 1852 (Van Rensselaer v Witbeck, 7 NY 517, 522). At issue there was the validity of an assessment certificate which differed from the statutory form in certain respects which we *5 found to be material. "The assessors have taken the precaution to negative all presumption that they had done their duty, by certifying that they had estimated the real estate, not according to its value, 'but as they deemed proper,’ and the personal, not 'according to their best information and belief, of its value,’ but 'according to the usual way of assessing.’ We are informed by the learned judge who delivered the opinion of the supreme court, that the usual method is to estimate property at less than half its value, under the obligation of an official oath, which requires its full value to be stated; If this be so, the practice should be corrected. In the second place, these proceedings show the importance of adhering to the law, since these assessors, if the surmise of the learned judge is well founded, though prepared to violate their duty and their oath of office, shrunk from testifying to a gross falsehood, to be recorded under their signatures.”
In People ex rel. Board of Supervisors v Fowler (55 NY 252, 254) the supervisors of Westchester County sought a writ of mandamus, compelling the assessors of the Town of Rye to file a proper certificate of assessment. Once again, the problem arose because of fractional assessments and, although 21 years had elapsed since the Witbeck decision, our attitude toward the custom had not changed.
"The affidavit of the defendant Purdy, one of the assessors of the town of Rye [shows] that it had been the custom, for several years, of the assessors of that town, in making the assessment roll, not to enter therein the valuation of real estate at its full value, or at the true or full value at which the assessors would appraise it in payment of a just debt due from a solvent debtor, but to insert the value at about one-third, or in some cases one-fourth the full and true value, and at one-third or one-fourth the sum at which they would appraise it in payment of a just debt from a solvent debtor, and that this was the plan or basis upon which the assessment roll of 1871 was made. The affidavit of the defendant Fowler, also one of the assessors, contains substantially the same statements, and the additional one that, in view of the practice * * * no other basis of assessment could be adopted 'in justice and fairness to the town of Rye.’ There was no contradiction of these affidavits, and the fact stands unchallenged upon the statements of the assessors themselves, that, in making their assessment, they deliberately violated the stat *6 ute and their official oath for the purpose of doing 'justice to the town of Rye.’
"The assessors made and subscribed an oath, annexed to the roll, in which they stated that, in making the assessment roll, they had estimated the value of the real estate therein at the sums which a majority of the assessors had decided was its full and true value, but they omitted to state that the valuations were those 'at which they would appraise the same in payment of a just debt due to a solvent debtor.’ The mandamus was sought to compel them to add the omitted clause to their affidavit. They, in answer, allege that they could not truthfully swear to that statement. This answer is conclusive. Courts do not sit to compel men to take false oaths, and whatever duty the assessors may have omitted, they owe no duty to the public to commit crime, and no public exigency can require it of them.” (Emphasis in original.)
The same type of criticism is found in a 1907 Third Department case (People ex rel. Congress Hall v Ouderkirk, 120 App Div 650). After affirming a determination, reducing the taxpayer’s assessment to the percentage prevailing in the taxing unit, Justice Cochrane, speaking for the court, stated (pp 654-655): "This is an opportune time to comment on the custom much too prevalent among assessors of assessing real estate at less than its full value in direct violation of the statute. Not only do assessors in following such custom violate their official duties, but consciously or unconsciously they swear to an untruth when in the verification of the assessment roll, which is required, they make oath that they 'have estimated the value of the said real estate at the sums which a majority of the assessors have decided to be the full value thereof.’ (Tax Law, § 37.) This case is a startling commentary on either the incompetency or willful official dereliction of the assessors. Having first verified their assessment roll wherein they made oath that they had estimated the value of the real estate at the sums which a majority of them decided to be the full value thereof, they proceeded to establish the falsity of such oath by proving the valuations to be far in excess of the assessments. They called different witnesses before the referee who testified that not merely in exceptional instances but that as a general rule the actual value of the property inquired about was nearly or quite double the amount for which it was assessed. The assessors seem to have considered their violation of law of no consequence provided only in making the various *7 assessments they violated it impartially. The referee specified in his report numerous parcels of real estate in reference to which the total assessed valuation was less than one-half the full value and reported 'that said parcels of real estate are typical of all the property in the town of Saratoga and fairly represent the ratio of actual assessments to full values in said town for the year 1905.’ If the assessors were awake to the plain requirements of their official duties and assessed all real estate as they are commanded to do at its full value a litigation like this could scarcely arise. The criticisms here made do not rest alone on these assessors. They have merely followed a custom prevalent in many communities. But it is a custom not only wholly repugnant to the plain mandates of the statute, but also radically at war with the official oaths of the assessors and also with their oaths to the assessment rolls.” (See, also, People ex rel. Sheldon v Fraser, 74 Hun 282, affd 145 NY 593.)
In the case now before us, the lower courts made no reference to these early decisions. They relied instead on C. H. O. B. Assoc. v Board of Assessors of County of Nassau (45 Misc 2d 184, affd 22 AD2d 1015, affd 16 NY2d 779) and its progeny (see, e.g., Matter of Connolly v Board of Assessors of County of Nassau, 32 AD2d 106; Nicolette v Village of Clyde, 34 AD2d 202; McAlevey v Williams, 41 AD2d 971; Matter of Drelich v Kahn, 60 Misc 2d 227). In C. H. O. B., the trial court stated (p 192): "Section 306 provides that all real property shall be assessed at full value thereof. Although full value has been held to be synonymous with market value (People ex rel. Parklin Operating Corp. v Miller, 287 NY 126), the courts have uniformly held that this section does not mandate assessments at 100% of full or market value. It requires merely that the assessments be at a uniform rate or percentage of full or market value for every type of property in the assessing unit. (Matter of Mid-Island Shopping Plaza v Podeyn, supra; Matter of Hartley Holding Corp. v Gabel, 13 NY2d 306; People ex rel. Yaras v Kinnaw, 303 NY 224). The Legislature through subdivision 3 of section 720 of the Real Property Tax Law has acknowledged and apparently sanctioned this State-wide practice.”
When the case reached our court in 1965, we affirmed without opinion (16 NY2d 779).
Actually "since [the C. H. O. B.] case involved a taxpayer’s action pursuant to section 51 of the General Municipal Law *8 and the complaint therein was dismissed for the plaintiffs failure to establish waste or injury”, the Second Department later recognized that "the observations there relating to the issue of legality [of fractional assessments] are dicta” (Matter of Connolly v Board of Assessors, supra, at p 107). Nevertheless they found that it was a "well-reasoned opinion” and a "very persuasive precedent” which should be followed (p 107). And, as indicated above, C. H. O. B. has spawned a number of lower court opinions upholding the practice. Thus the custom of fractional assessments, once roundly condemned as a flagrant violation of the statute, has endured and acquired a new life through a kind of legislation by violation.
The C. H. O. B. decision assumes that fractional assessment is an ancient custom, never before challenged, which has, over the years, acquired recognition and, by implication, legal status from the courts and the Legislature. As the township notes, it involves two basic arguments: (1) By holding in "numerous cases” that "assessments [must] be at a uniform rate or percentage of full or market value for all property in the assessing unit” we have decided, sub silentio, "that Section 306 does not mandate assessments at 100% of full or market value” and thus fractional assessments are legal; (2) by establishing the State Board of Equalization the Legislature has indicated that section 306 of the Real Property Tax Law does not require assessment at 100% of market or full value but only that assessments be made at a uniform percentage of full value for every type of property within the assessing unit. Neither argument bears up under close analysis.
Regarding the first point we note that historically an assessment which was at or below full value, but above the average rate, presented a dilemma to the courts. On the one hand there was a rather obvious violation of equal protection. But on the other hand the requirements of the statute had been met and if the court ordered a reduction from full value, it would be compelling the assessors to "do an unlawful act” (People ex rel. Sheldon v Fraser, supra, p 284). Thus many courts "held themselves precluded by the letter of the law from doing more than advise the complainant that he had the theoretically satisfactory privilege of suing out a writ of mandamus to compel the assessors to revalue every other piece of property in the jurisdiction” (1 Bonbright, Valuation of Property, p 501).
*9 The Supreme Court felt that this approach denied the taxpayer an effective remedy. They put an end to the practice and resolved the dilemma, by holding that "where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred” (Sioux City Bridge Co. v Dakota County, 260 US 441, 446). Now that the courts have been forced to choose equality over the full value standard — when it appears that one or the other must be violated — the respondent draws the type of conclusion the courts originally sought to avoid.
Viewed against this background it is obvious that these inequality decisions, reducing assessments to the uniform rate, are not premised on the legality of fractional assessments (see, e.g., Russman v Luckett, 391 SW2d 694, 697, 698 [Ky]) and it is ironic that the township has inferred that they are.
Similarly we find no merit to the argument that by establishing the State Equalization Board the Legislature has indicated that the requirements of section 306 are satisfied if assessments are simply made at a uniform percentage of full value throughout the taxing unit. As the petitioner noted the State Equalization Board is only concerned with maintaining equality among taxing units. It " 'does not purport to measure the ratio of assessed valuation to full value of any individual property’ ” (Matter of O’Brien v Assessor of Town of Mamaroneck, 20 NY2d 587, 596) nor is it designed to insure that assessments are made at a uniform percentage of full value within the taxing unit. The only significance the board has in relation to this problem is found in section 720 of the Real Property Tax Law which permits a taxpayer in an inequality proceeding to rely on the ratio established by the board in proving his claim. But this provision was merely designed to ease the taxpayers’ burden of proof in inequality cases (see Guth Realty v Gingold, 34 NY2d 440) which, as indicated earlier, is not premised on the legality of fractional assessments.
The creation of the board however, does reflect the Legislature’s awareness of the fact that the local officials charged with making assessments pursuant to section 306 are using a percentage of full value, and we recognize that "Where the practical construction of a statute is well known, the Legislature is charged with knowledge and its failure to interfere indicates acquiescence” (Engle v Talarico, 33 NY2d 237, 242). *10 But the application of this principle presupposes first, that the statute is capable of more than one interpretation, and secondly, that our court has not previously resolved the ambiguity. If there is any ambiguity in section 306 it is found solely in the term "value”. But once that is resolved — and, as indicated we have determined that market value is the standard— it is quite evident that the "full” measure, and not a percentage must be used. And, if there is a hidden ambiguity, we have already committed ourselves to the view that the statute does not authorize fractional assessments. Thus, in this case, the "practical construction” is nothing more than a violation, which, no matter how persistent, widespread and uncorrected, cannot alter the meaning of the statute (cf. District of Columbia v Thompson Co., 346 US 100, 113-114; Russman v Luckett, 391 SW2d 694 [Ky]). As we stated in Matter of Wendell v Lavin, (246 NY 115, 120), "[sjometimes the interpretation of a doubtful and obscure clause in an act of the Legislature, or in a Constitution, may be aided by the practice which has grown up under it, but plain and clear provisions of a Constitution require no such aid; they are to be enforced and brought to life early or late, and must not be smothered by the accumulation of customs or violations.”
One of the most peculiar aspects of the township’s case is the narrowness of their defense of the practice of fractional assessments. They are satisfied to rest on the theory "thus it has been, thus it always must be”, without making any effort to explain how the custom began, whether it serves any useful purpose, and what would happen if the assessors complied, or were made to comply, with the strict letter of the law. Our own cases do not discuss these points; but they have been extensively reviewed and debated by scholarly commentators and by the courts in other jurisdictions.
The vast majority of States require assessors, either by statute or constitutional prescription, to assess at full value, true value, market value or some equivalent standard. (See Note, 68 Yale LJ 335-387). Two States have expressly provided by statute that this requires assessment at 100% of value (see 13 Ariz Rev Stat Ann., § 42-227; California Revenue & Taxation Code, §§ 401, 408). Several States have specifically authorized fractional assessments, and this seems to be the modern trend. In 1917 there were four States in this latter category (see Greene v Louisville Interurban R. R. Co., 244 US 499, 516); by 1958 there were eight (see Note, 68 Yale LJ 335, *11 387); and, as of 1962 15 States had enacted legislation providing for fractional assessments, either at a fixed percentage or according to local option (Note, 75 Harvard L Rev, 1374, 1377, n 28).
Where full value is required, the standard has been almost universally disregarded. A 1957 study by the United States Census Bureau placed the average assessment ratio in the country at 30% of actual value (see Bird, The General Property Tax: Findings of the 1957 Census of Governments 40).
No one seems to know exactly how the practice of fractional assessment began. In an early case the Supreme Court suggested that: "If we look for the reason for this common consent to substitute a custom for the positive rule of the statute, it will probably be found in. the difficulty of subjecting personal property, and especially invested capital, to the inspection of the assessor and the grasp of the collector. The effort of the land-owner, whose property lies open to view, which can be subjected to the lien of a tax not to be escaped by removal, or hiding, to produce something like actual equality of burden by an underevaluation of his land, has led to this result” (Cummings v National Bank, 101 US 153, 163).
This may well explain the origin of the rule, but it does not account for its remarkable powers of endurance, especially in a State like New York, which has removed personal property from the tax rolls (Real Property Tax Law, § 300). Its survival depends on other factors none of which are particularly commendable.
Bonbright, in his treatise (op. cit.), lists (p 498) "several reasons for the persistence of partial valuation. Gullible taxpayers associate a larger valuation with a larger tax, or at any rate are less contentious about a relatively excessive assessment if it does not exceed their estimate of true value. The ability to maintain a stable rate and to increase revenue by tampering with the tax base — a change which calls for less publicity and less opposition — is naturally desired by the party in power. Occasionally, partial valuation is intended as a substitute for a varied system of rates; i.e., different forms of property, while nominally taxed at the same rate, are in fact taxed at differing rates by being assessed at different proportions of full values. Undervaluation of realty is sometimes justified as compensating for the elusiveness of personalty; but even if the latter is assessed fully when caught, experience *12 has shown that the net result is to furnish an additional incentive for evasion.
"Another inducement to undervaluation has been that, since the state relies on the property tax for part of its revenue, the county assessors seek to lighten their constitutents’ burden at the expense of the rest of the state by assessing the local property at a lower percentage than is applied elsewhere. This process has often resulted in a competition between counties as to which could most nearly approach the limit of nominal valuation. With the increasing trend in some states toward reserving the property tax for the support cf the local communities, and in other states toward the creation of state boards of equalization, the enthusiasm for percentage valuation has been dampened.”
Most of these considerations have probably served to perpetuate the custom in New York; but there may be other factors at work.
This State, of course, does not depend on real property taxes as a source of State revenue. However the State does supply financial aid to communities based primarily on assessed valuation (State Finance Law, § 54, subd 1, par c; § 54, subd 2, pars a, c) and this undoubtedly furnishes "another inducement to undervaluation.” The activities of the State Equalization Board are meant to correct this problem but as one commentator observes "possibly local tax officials believe that there is no harm in trying” (Johnson, Fractional Ratios and Their Effect on Achievement of Uniform Assessment, the Property Tax: Problems and Potentials, Tax Institute of America, p 210).
Since the State Constitution provides that "[assessments shall in no case exceed full value” (NY State Const, art XVI, § 2) assessing at a percentage of value discourages claims of unconstitutional overvaluation. Then the taxpayer is left with the far more difficult task of proving comparative inequality.
Obviously these reasons are all good reasons for abolishing the custom (see, e.g., Note, 68 Yale LJ 335, op. cit.; Note, 75 Harvard L Rev 1374; Kilmer, Legal Requirements for Equality in Tax Assessments, 25 Albany L Rev 203, op. cit.). As Bonbright observes (op. cit., pp 497-498): "Theoretically the taxpayer’s pocket is not in the least affected by uniform undervaluation or overvaluation. Systematic undervaluation diminishes the tax base and the tax rate must therefore rise in order to supply the required government revenue. * * * *13 The objections to the practice of undervaluation are patent. In the first place, except where sanctioned by statute, it involves a generally known and sanctioned disregard by officials of the law requiring them to assess property at its full and fair value. The other great vice is that the percentage of undervaluation is rarely a matter of common knowledge, so that it is extremely difficult to ascertain whether there is uniformity in the proportion or whether, through incompetence, favoritism, or corruption of the assessors, some portions of the taxpaying body are bearing the others’ burdens, as between either individuals or local groups.”
In recent years the high courts in several States, noting the mounting criticism, have held that full value means what it says and that the practice of fractional assessments is illegal (see, e.g., Switz v Township of Middletown, 23 NJ 580; Ingraham v Town & City of Bristol, 144 Conn 374; Russman v Luckett, 391 SW2d 694 [Ky]; Bettigole v Assessors of Springfield, 343 Mass 223; Walter v Schuler, 176 So 2d 81 [Fla]; Southern Ry. Co. v Clement, 415 SW2d 146 [Tenn]).
In sum, for nearly 200 years our statutes have required assessments to be made at full value and for nearly 200 years assessments have been made on a percentage basis throughout the State. The practice has time on its side and nothing else. It has been tolerated by the Legislature, criticized by the commentators and found by our own court to involve a flagrant violation of the statute. Nevertheless the practice has become so widespread and been so consistently followed that it has acquired an aura of assumed legality. The assessors in Islip inherited the custom and it is conceded that they have continued it. Throughout the years taxes have been levied and paid, or upon default, tax liens have arisen, followed by foreclosure and ultimate transfer of title, all on reliance on the apparent legality of fractional assessments. Now we have before us a petition directly challenging the practice and seeking an order "declaring] the entire assessment roll of the Town of Islip for the year 1968-1969 as illegal, null and void”. In the alternative the petitioner requests that we direct the township to "make future assessments of all property on the assessment rolls of said town at the full value”.
The petitioner recognizes that if we invalidate the assessment roll this could bring "fiscal chaos to the Town of Islip”. If the petitioner had sought mandamus this alone would be sufficient to deny relief, for we have long held that the courts *14 should not act "so as to cause disorder and confusion in public affairs even though there may be a strict legal right” (Matter of Andresen v Rice, 277 NY 271, 282). We have not previously considered whether the same principle should apply to a claim of illegality brought pursuant to section 706 of the Real Property Tax Law. However since the nature of the relief and the public impact are identical, we believe it is incumbent on the courts, where their discretion is involved, to exercise the same degree of restraint whenever a settled assessment roll or property rights based thereon are challenged for illegality. And this should be true whether the proceeding be labeled mandamus or otherwise. It follows from this that we will not, in this action, on the equity side, disturb the settled assessment rolls. The taxes levied and paid, the tax liens, matured or pending, and completed transfers of foreclosed properties made in reliance on the assessment rolls are matters not now before the court and on which therefore it should not pass. We assume however that should these questions arise, the courts will exercise the sound discretion with which they are vested. To this extent we agree with the courts below that the petitioner was not entitled to have the past assessment rolls declared a nullity.
This does not mean however that we must indorse the practice or withhold relief insofar as future assessments are concerned. Future compliance with the full value requirement will undoubtedly cause some disruption of existing procedures, but time should cure the problem. The difficulty of transition is sufficient reason to defer relief, but not to deny it. The petitioner thus is entitled to an order directing the township to make future assessments at full value as required by section 306 of the Real Property Tax Law. The order however should not go into effect immediately. To make this transition, the township should be allowed a reasonable time, but not later than December 31, 1976. In the interim assessments may be made in accordance with the existing practice and any tax levies, liens, foreclosures or transfers based on such assessments shall not be subject to challenge for failing to comply with section 306 of the Real Property Tax Law.
Accordingly, the order of the Appellate Division should be modified to the extent of directing that, within a reasonable time, but in no event later than December 31, 1976, the respondent shall assess the real property within the township at full value.