[622 NYS2d 123]

In the Matter of Town of Stony Creek, Appellant, v New York State Board of Equalization and Assessment et al., Respondents.

Third Department, January 26, 1995

## APPEARANCES OF COUNSEL

*Miller, Mannix & Pratt, P. C.,* Glens Falls *(John C. Mannix, Jr.,* of counsel), for appellant.

*Dennis C. Vacco, Attorney-General,* Albany *(Daniel Smirlock* of counsel), for respondents.

## OPINION OF THE COURT

YESAWICH JR., J.

Respondent State Board of Equalization and Assessment (hereinafter respondent) is charged with calculating the equalization rate, that is, the ratio of assessed value to fair market value of all taxable property, for each municipality in the State *(see,* RPTL 1202 [1] [a]), and has promulgated regulations that establish the methods by which it does so *(see,* 9 NYCRR part 186). The equalization rate is utilized, *inter alia,* to spread the burden of school taxes equitably among the municipalities in each school district, so that each contributes proportionally on the basis of the actual worth of its real property, rather than on the basis of the assessed value of that property. Otherwise, a municipality could decrease its share of school taxes simply by assessing its property at a smaller fraction of its actual value.

For example, if a school district is comprised of two towns, each of which has taxable property valued at $1,000,000, each town should pay the same amount of school taxes. However, if one town assesses its property at 50% of market value ($500,000), and the other assesses at 25% ($250,000), and the total school tax levy is charged at a flat rate per $1,000 of assessed value, the first town would pay twice as much as the second.[1] To avoid this inequality, each town's assessment

---

1. In this hypothetical, if the total tax levy were $20,000, that figure would be divided by the total assessment of $750,000, resulting in a tax of $26.67 per $1,000. The taxpayers in the first town would pay $13,335 (26.67 × 500), while those in the second would pay only half as much (26.67 × 250).

roll is divided by that town's equalization rate (50% for the first town, 25% for the second), and the resulting figures ($1,000,000 in each case) are used to arrive at a proportional division of the total tax levy for the district, which in this case results in the desired equal tax allocation (see, RPTL 1314). Finally, the tax rate necessary to raise each town's allocated share of the taxes is determined by dividing that share by the town's assessment roll.[2]

In this combined proceeding and action, petitioner, having pursued all available administrative remedies, challenges the validity of the methodology embodied in respondent's regulations, contending that it improperly excluded, from the total assessed value of petitioner's real property, a large "transition assessment"—an assessment entered on petitioner's assessment roll for the purpose of determining the amount of State aid to be paid after a State takeover of formerly taxable property (see, RPTL 545; 9 NYCRR 186-1.1 [a] [58] [ii]). The exclusion of transition assessments from the total assessed value produces a lower equalization rate, which in turn results in petitioner being held responsible for a larger portion of the total school tax levy of the district of which it is a part. Because its taxes are higher than they would be if the transition assessments were included in the calculation of its equalization rate, petitioner insists that the regulations, as they stand, are inequitable. Supreme Court upheld the applicable regulations, finding them to be rationally based, and petitioner appeals.

What petitioner fails to realize is that the State's formula does not impose an unfair burden on a town with a transition assessment, but merely assures that such a town is charged for its fair share of the school taxes, that is, the amount it would have paid had the land taken by the State remained on the assessment rolls. Significant in this regard is the fact that the amount of revenue that would have been generated from taxes imposed upon that land is being paid by the State—the Comptroller pays, as State aid, an amount equivalent to the taxes that would be levied on the transition assessment (see, RPTL 545 [5])—resulting in no change in the tax burden imposed on any individual taxpayer in the town. The exclu-

---

2. Here, the first town's rate would be $10,000/$500,000, or $20 per thousand of assessed value, while the second town would have to tax at a rate of $40 per thousand ($10,000/$250,000). Each would thus end up paying $10,000 in school taxes, or $10 per thousand of actual fair market value.

sion of transition assessments from the equalization rate calculation, despite their inclusion in the total assessed value for the purpose of calculating the apportionment of taxes, is necessary to accomplish this result and, accordingly, to avoid overburdening the other towns in the school district.[3]

Petitioner's contentions notwithstanding, the regulations at issue do not conflict with the language of RPTL 545, which requires only that transition assessments be treated as taxable assessed valuation "on the assessment roll" (RPTL 545 [4]), not that they be utilized in arriving at equalization rates. The equalization rate calculated in accordance with these regulations still represents the percentage of full value at which taxable real property is assessed (see, RPTL 1202 [1] [a]), as can be seen from the illustration set forth in note 3 (supra). Moreover, the regulations are consistent with the purpose underlying the establishment of transition assessments, which is to minimize the effect of State takings on the tax base of the municipality, and maintain the status quo; they are in no way irrational. When the regulations are properly comprehended, it cannot be said that respondent, which is charged "with maintaining equality among taxing units" (Matter of

---

3. For example, if Towns A and B from the previous example each consist entirely of $1,000,000 of privately owned, taxable land, each will pay one half of the school tax levy of $20,000. If the State appropriates one half (or $500,000 worth) of A's property, A will be left with property valued at only $500,000 (both parties concede that State land has no market value). A will also now have a transition assessment of $250,000, reflecting the prior assessed value of the land taken, and a total assessment roll of $500,000, the same as it had initially. If the transition assessment were included in the assessed value when calculating A's equalization rate, the latter would be 100% (assessed value of $500,000/fair market value of $500,000). That rate, applied to A's assessment roll ($500,000/100%), results in a full valuation (see, RPTL 1314 [1] [a]) of $500,000, while B's rate applied to its roll ($250,000/25%) yields a full valuation of $1,000,000. Since A's valuation is one third of the total of $1,500,000, A would pay only one third of the total tax levy, while B would pay the other two thirds (see, ibid.).

The regulations at issue solve this problem by excluding the transition assessment from the assessed value when calculating A's equalization rate. When it is excluded, A's rate is again 50% ($250,000 assessed value, excluding transition assessment/$500,000 fair market value = 50%), and when this rate is applied to A's entire assessment roll, as mandated by RPTL 1314, it results in a full valuation of $1,000,000. With A's and B's full valuation each being $1,000,000, they will again shoulder the tax burden equally, with each paying $10,000 of the $20,000 total. While A has only $250,000 of taxable assessments upon which to apply the rate of $20 per thousand, resulting in tax revenue of $5,000, the remaining $5,000 will be paid by the State on its $250,000 transition assessment.

*Hellerstein v Assessor of Town of Islip,* 37 NY2d 1, 9), has exceeded its authority by taking reasonable steps to do just that.

CARDONA, P. J., CREW III, CASEY and PETERS, JJ., concur.

Ordered that the judgment is affirmed, without costs.