[864 NE2d 1261, 832 NYS2d 862]

In the Matter of JOHN J. O'SHEA, Appellant, v BOARD OF ASSESSORS OF NASSAU COUNTY et al., Respondents.

In the Matter of JACK MINKOFF et al., Appellants, v COUNTY OF NASSAU et al., Respondents, et al., Respondents.

In the Matter of HARRY BRIFFEL et al., Appellants, v COUNTY OF NASSAU et al., Respondents.

Argued January 11, 2007; decided February 13, 2007

250

**POINTS OF COUNSEL**

*John J. O'Shea,* Manhasset, appellant pro se in the first above-entitled proceeding. The lower court erroneously interpreted Real Property Tax Law § 1805 (1). (*Matter of Nuzzolese v Board of Assessors of County of Nassau,* 172 AD2d 611; *Matter*

*of Meadowbrook Plaza Assoc. v Board of Assessors,* 174 AD2d 744.)

*Fred N. Perry,* Dix Hills, for appellants in the second above-entitled proceeding. I. The court below nullified RPTL 1805 and frustrated its legislative purpose contrary to primary statutory construction laws and principles. (*National Org. for Women v Metropolitan Life Ins. Co.,* 131 AD2d 356, 70 NY2d 939; *Matter of Petterson v Daystrom Corp.,* 17 NY2d 32; *Matter of Christopher F.,* 260 AD2d 97; *Matter of Town of New Castle v Kaufmann,* 72 NY2d 684; *Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist.,* 86 NY2d 72; *Matter of OnBank & Trust Co.,* 90 NY2d 725; *Matter of Hellerstein v Assessor of Town of Islip,* 37 NY2d 1.) II. The RPTL defines "assessment" as the full valuation of property, or at minimum, includes full valuation within its definition. (*Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist.,* 86 NY2d 72; *Matter of STG Corp. v Town of Green-ville,* 190 Misc 2d 634; *Matter of Plato's Cave Corp. v State Liq. Auth.,* 68 NY2d 791; *Matter of Robert J.,* 2 NY3d 339.)

*Daniel J. Dillon,* Lido Beach, for appellants in the third above-entitled proceeding. I. The intermediate appellate court concluded that the trial court manipulated the equalization rate so as to defeat the application of Real Property Tax Law § 1805. But because the statute did not expressly prohibit it, the action was regarded as authorized. This is a violation of all conventional statutory and judicial mandates regarding legislative interpretation. (*Desiderio v Ochs,* 100 NY2d 159; *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington,* 97 NY2d 86; *N.Y.A.A.D., Inc. v State of New York,* 1 NY3d 245; *Foss v City of Rochester,* 65 NY2d 247; *Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist.,* 86 NY2d 72; *People v Garson,* 6 NY3d 604.) II. The City of New York has continuously followed the limits on assessment increases since the passage of Real Property Tax Law § 1805. Nassau County effectively exempted itself from the law between tax years beginning January 2003 and January 2005. As of tax year beginning January 2006 Nassau County began to apply the limitations of section 1805. (*Matter of Michael B.,* 80 NY2d 299.)

*Lorna B. Goodman, County Attorney,* Mineola (*Dennis J. Saffran* of counsel), for respondents in the first, second and third above-entitled proceedings. The term "assessment" in RPTL

1805 means a property's "fractional assessment" at a percentage of full value pursuant to RPTL 305, *not* appraisal of its full market value. (*Desiderio v Ochs,* 100 NY2d 159; *Bryant v New York City Health & Hosps. Corp.,* 93 NY2d 592; *Khela v Neiger,* 85 NY2d 333; *Matter of Hellerstein v Assessor of Town of Islip,* 37 NY2d 1; *41 Kew Gardens Rd. Assoc. v Tyburski,* 70 NY2d 325; *Foss v City of Rochester,* 65 NY2d 247; *City of New York v New York State Div. of Hous. & Community Renewal,* 97 NY2d 216; *Matter of Gruber [New York City Dept. of Personnel—Sweeney],* 89 NY2d 225; *Matter of New York State Dormitory Auth. v Board of Trustees of Hyde Park Fire & Water Dist.,* 86 NY2d 72; *Matter of STG Corp. v Town of Greenville,* 190 Misc 2d 634.)

## OPINION OF THE COURT

READ, J.

The thousands of petitioners in these three proceedings are owners of residential real property in Nassau County. As a result of a countywide revaluation mandated by a stipulation of settlement in *Coleman v County of Nassau* (Sup Ct, Nassau County, Mar. 29, 2000, Winslow, J., Index No. 97-30380), the appraised or full market value of their homes soared, often at least doubling. Petitioners complain that respondents County of Nassau, Board of Assessors of Nassau County and Nassau County Assessment Review Commission (collectively or individually referred to as the County) thus violated Real Property Tax Law § 1805 (1), which limits increases on assessments on residential property in Nassau County to not more than six percent per year and 20% over any five-year period. Supreme Court dismissed the petitions, and the Appellate Division affirmed, with two Justices dissenting. Petitioners appealed as of right, and we now affirm.

### I.

This appeal takes us back three decades to our decision in *Matter of Hellerstein v Assessor of Town of Islip* (37 NY2d 1 [1975]), which became "something of a *cause célèbre* for critics of the property tax" (Beebe and Sinnott, *In the Wake of Hellerstein: Whither New York? Part One,* 43 Alb L Rev 203, 204 [1979]). In *Hellerstein,* we considered whether the Town of Islip's long-standing practice of assessing real property at some fraction of its full or fair market value was valid in light of the statutory mandate that all real property in New York State be assessed at full market value and taxed at a uniform rate within

a single taxing jurisdiction (*see* former RPTL 306). We held that it was not. We recognized the potentially disruptive effects of our decision, however, and so refused to invalidate the specific assessment roll at issue. We gave the Town until December 31, 1976 to conform to the statute, allowing it to continue its existing practice of fractional assessment in the interim, and declaring that any ensuing "tax levies, liens, foreclosures or transfers based on such assessments" were immune from challenge for failure to comply with the law (37 NY2d at 14).

Because of the ubiquity of fractional assessment, our decision in *Hellerstein* reverberated throughout the state. Under a hodgepodge of fractional assessment regimes that had proliferated over the years, localities routinely assessed commercial and industrial property at higher ratios (assessed value over market value) than residential property. But as a result of *Hellerstein*, all real property would be subject to the same effective tax rate, or taxes per dollar of full market value. As reflected in the extensive newspaper coverage of the time, there was widespread fear that, without ameliorative legislative action, *Hellerstein* would force an unwelcome shift of a significant portion of the property tax burden from businesses to homeowners (*see e.g.* Kaiser, Issue and Debate, *Assessing Real Estate for Taxation at 100 Percent of Full Market Value*, New York Times, Mar. 10, 1976, at 32; Shaman, *Revaluation's Impact on the Homeowner*, New York Times, Apr. 15, 1979, at LI1). At the same time, Nassau County, which valued its residential property using 1938 construction costs less depreciation plus the land's market value as of 1964, faced an onslaught of tax certiorari suits brought by commercial and industrial property owners. In these suits, the petitioners challenged their property tax assessments on the ground of inequality, claiming that the County had assessed their properties well above the state equalization rate while assessing homes well below it; they sought refunds of back taxes potentially costing the County hundreds of millions of dollars (*see e.g. 860 Executive Towers v Board of Assessors of County of Nassau*, 53 AD2d 463 [2d Dept 1976], *affd sub nom. Matter of Pierre Pellaton Apts. v Board of Assessors of County of Nassau*, 43 NY2d 769 [1977] [reaffirming that state equalization rate may be used as sole basis for determining ratio of assessed value to full value in an assessment challenge on the ground of inequality]).

After six years of fits and starts, legislative moratoria and studies and task force reports, the Legislature overrode a

gubernatorial veto to enact chapter 1057 of the Laws of 1981. This statute repealed section 306 of the Real Property Tax Law, the provision that had required full value assessment; added a new section 305 (2) to specify generally that "[a]ll real property in each assessing unit shall be assessed at a uniform percentage of value (fractional assessment)"; and, as relevant here, added a new article 18 to apply to special assessing units, by definition limited to New York City and Nassau County (*see* RPTL 1801 [a]).

Article 18 allowed special assessing units to apply different fractional assessment percentages to each of four classes of property: one-, two- and three-family residential property (class one); all other residential property except hotels and motels and other similar commercial property (class two); utility property (class three); and all other (class four) (*see* RPTL 1802). Article 18 was "designed to maintain the stability of relative property class tax burdens" (Budget Report on Bills, at 1, Bill Jacket, L 1981, ch 1057).[1] In general, article 18 authorized a special assessing unit to fix class shares using the tax roll for the 1981-1982 levy, with leeway to increase or decrease shares in subsequent years up to five percent to accommodate changes in the roll or new construction (former RPTL 1803); and to increase individual assessments for class one property as limited by section 1805 (1), which states that

> "[t]he assessor of any special assessing unit shall not increase the assessment of any individual parcel classified in class one in any one year, as measured from the assessment on the previous year's assessment roll, by more than six percent and shall not increase such assessment by more than twenty percent in any five-year period."

Further, the statute eliminated the use of the state equalization rate as evidence of inequality in future tax certiorari proceedings against special assessing units (*see* former RPTL 720 [3] [b], [c]; *see also*, RPTL 720 [3]).

The bill subsequently enacted as chapter 1057 was extremely controversial. It was the subject of extensive debate upon its

---

1. Chapter 1057 also enacted a new article 19 of the Real Property Tax Law. This provision "pertain[ed] to upstate municipalities that decide[d] a full revaluation program [was] necessary," and was tailored "to avoid a shift of [the] property tax burden to residential property from other property classes as a result of a revaluation program" (Budget Report on Bills, at 2, Bill Jacket, L 1981, ch 1057). Article 19 accomplished this goal by providing for an optional two-class taxing structure (*see Foss v City of Rochester*, 65 NY2d 247 [1985]).

initial adoption, and also upon its reenactment by two-thirds vote after the Governor's veto. Members of the Assembly and Senators expressed the sentiment that, despite its imperfections, this bill was "the only ball game in town" to prevent a dramatic shift of real property taxes from businesses to homeowners, and provide a high degree of stability in the relative tax burdens of these categories of taxpayers (*see* NY Assembly Debate on Senate-Assembly Bill S7000-A, A9200, Oct. 28, 1981, at 12,797, 12,799, 12,801, 12,803; Dec. 3, 1981, at 13,474, 13,483-13,484; NY Senate Debate on Senate-Assembly Bill S7000-A, A9200, Oct. 28, 1981, at 7,505-7,506, 7,516-7,519, 7,549-7,550; Dec. 3, 1981, at 8,107, 8,111).

The County's representatives in the Legislature sought certain specific assurances from the bill's advocates in both houses. The following colloquy took place between Assemblyman Parola and Assemblyman Hochbrueckner, the bill's champion in the Assembly:

> "MR. PAROLA: . . . [M]y questions really relate directly to Nassau County and its unique situation. Will, under this bill, 7000-A, if the Governor signs it into law, will it reverse the present court order requiring Nassau County to reassess its real property?
>
> "MR. HOCHBRUECKNER: In response to your question, yes, it will.
>
> "MR. PAROLA: Second question[.] [U]nder the language of 7000-A will Nassau County be able to continue its present method of assessing all real property based on construction costs as it has in the past?
>
> "MR. HOCHBRUECKNER: Yes, again" (NY Assembly Debate on Senate-Assembly Bill S7000-A, A9200, Oct. 28, 1981, at 12,837-12,838).

Similarly, in the Senate debate on October 28, 1981, Senator Levy asked Senator Anderson, the bill's main proponent in the upper chamber, if he would yield to two questions from him and three colleagues, which they were "asked to present" by the Chairman of the Board of Assessors of Nassau County "for purposes of establishing legislative intent":

> "SENATOR LEVY: The first question is, will Senate

7000A if signed into law by the Governor reverse the present court order requiring Nassau County to reassess its real property?

"SENATOR ANDERSON: Yes. And the reason is that we are repealing Section 306 by the very act before us.

"SENATOR LEVY: Thank you Senator. The second question is, under the language of 7000A, will Nassau County be able to continue its present method of assessing real property based on construction cost?

"SENATOR ANDERSON: Yes" (NY Senate Debate on Senate-Assembly Bill S7000-A, A9200, Oct. 28, 1981, at 7,510).

Subsequently, Senator Levy broadened his question by asking whether the County would "be able to continue its present method of assessing *all* real property based on construction costs," and Senator Anderson again answered affirmatively (*id.* at 7,582 [emphasis added]).

## II.

While *Hellerstein* and its aftermath bear critically on this appeal, *Coleman* is, of course, its mainspring. As already noted, Nassau County for many decades based the valuation of residential property on 1938 construction costs less depreciation plus the land's market value as of 1964. That is, valuation was tied into replacement cost and was completely divorced from current market value. On October 30, 1997, the *Coleman* plaintiffs sued the County in state court under federal civil rights and fair housing statutes and the Nassau County Charter. They contended that because market values for houses in affluent areas had increased sharply while market values had remained stagnant or declined in low-income areas, poor and minority homeowners were shouldering a disproportionate and discriminatory share of the countywide property tax burden. The United States and the State of New York intervened in the action to support the plaintiffs' position.

The parties in this widely reported case eventually entered into a stipulation of settlement, approved by Supreme Court on March 29, 2000. Under paragraph II (1) of the *Coleman* decree, the County agreed to "update and modernize [its] assessment rolls for residential properties," and to "adopt a revaluation system and tax assessment roll to that end that [was] fair,

nondiscriminatory, scientific and equitable," and imposed a uniform percentage of value or fractional assessment, consistent with standards adopted by the Office of Real Property Services, based on fair market value. The decree contemplated completion of the called-for mass revaluation in time for the assessment roll to be published on January 1, 2003, and set numerous interim benchmarks to facilitate meeting this deadline. The decree remained in effect and Supreme Court retained jurisdiction for three years following adoption of the new assessment roll.

Paragraph II (7) of the decree, which is at the core of petitioners' complaints on this appeal, committed the County, at the end of its revaluation work and in time to meet the January 1, 2003 implementation date, to

> "submit to the parties and the Court, for approval, a new Class I residential property real estate tax assessment roll that (i) relies upon fair market value; (ii) meets the requirements of par. II (1) [i.e., that was fair, nondiscriminatory, scientific, equitable, etc.] . . . , and (iii) assesses all Class I residential property in [the County] at a uniform percentage of value (fractional assessment) such that the uniform application of such fractional assessment rate does not result in any assessment for any individual parcel of Class I residential property that would require the application of RPTL 1805 to limit any assessment, except that if the fractional assessment rate selected results in not more than .5% of the total residential properties being subject to the limitations of RPTL 1805, such rate shall not be considered in violation of this paragraph."

As noted previously, section 1805 (1) caps assessment increases for residential property to no more than six percent per year and 20% in five years. The parties included paragraph II (7) to make sure that the County crafted the new assessment roll in such a way as to limit the operation of section 1805 (1). Otherwise, homeowners whose real property had historically been overassessed would have continued for many more years to subsidize homeowners whose real property had historically been underassessed (e.g., older houses in more affluent communities). Of course, the entire goal of the *Coleman* decree was to eliminate this inequity, not to lock it in for the foreseeable future.

The only way for the County to comply with paragraph II (7) was to lower the fraction by which every residential parcel's full market value was to be multiplied to fix the assessed value. The tax rate would then be applied to the assessed value to compute the homeowner's taxes. To that end, on October 25, 2002 the County adopted a fractional assessment percentage or rate of one percent of full market value.[2] In November 2002 the County submitted its proposed 2003 reassessment roll to Supreme Court for its approval, as required by the *Coleman* decree. The assessed values on the January 1, 2003 assessment roll were less than 106% of those on the January 1, 2002 roll for all but about 0.47% of the residential properties revalued. Following several days of hearings, the court conditionally approved the new roll in an order dated December 20, 2002, and it went into effect on January 1, 2003. On March 8, 2003, the court adhered to its earlier order approving the roll, with a few modifications not relevant to this case.

As a result of the *Coleman* decree, the County reassessed 368,043 residential (as well as 44,881 commercial) parcels over a three-year period at a cost of roughly $35 million. As Supreme Court noted, this enormous undertaking embraced "site visits, photographs, sketches, inspection of public records, collection of massive amounts of data for appraisal analysis, a comprehensive public information campaign that included a web site, informal in-person tax-payer review-of-value procedures, and the creation and utilization of a new computer software-enabled property valuation system" (*Coleman v County of Nassau, supra,* slip op at 4 [Mar. 8, 2003]).

### III.

None of the petitioners appeared at the approval hearing for the new assessment roll, or submitted comments to Supreme Court to oppose its adoption. Instead, they commenced these proceedings seeking tax refunds several months after the new assessment roll—the fruit of the well-known, three-year, $35 million revaluation venture—was put in place.

The County's plan for complying with both the *Coleman* decree and Real Property Tax Law § 1805 (1) was never a secret. As petitioners concede, the County's only option was to lower the fractional assessment percentage for class one property. As a result of doing this, the County limited the number of

---

**2.** According to petitioners, the comparable rate in 2002 was 2.11%.

residential parcels with fractional assessments exceeding the six percent cap. But petitioners contend that the word "assessment" in section 1805 (1) can only mean full valuation or full market value or appraised fair market value, not fractional assessment; and while their fractional assessments for 2003 did not exceed their fractional assessments for 2002 by more than six percent, the assessed full value of their houses increased dramatically from 2002 to 2003, as did their taxes. They argue that the County's interpretation eviscerates or nullifies section 1805 (1), which the Legislature enacted to protect taxpayers from just the kind of sudden and drastic tax increases that they experienced.

As the Appellate Division pointed out, however, section 1805 (1) "places no limits on changes in the fractional assessment rate, which is set by the assessing unit, nor does it limit the ultimate tax to be imposed" (31 AD3d 79, 81 [2d Dept 2006]). Indeed, chapter 1057 of the Laws of 1981, adopted in response to *Hellerstein,* was principally aimed at protecting residential taxpayers from tax increases caused by tax shifts from businesses to homeowners as a result of revaluation, not tax increases driven by market forces. Similarly, in article 18, the Legislature sought to stabilize businesses' and homeowners' respective shares of the real property tax burden (*see* NY Assembly Debate on Senate-Assembly Bill S7000-A, A9200, Oct. 28, 1981, at 12,823-12,824, 12,844-12,847). This was particularly important for the County, which was beset by extensive tax certiorari litigation that threatened to saddle homeowners with a considerably larger share of the tax levy. In their questions during the Assembly and Senate debates, the County's legislative representatives were careful to establish that the County would no longer be required to revalue, and that chapter 1057 would cure or short-circuit its litigation woes.

Concomitantly, the legislative history does not in any way suggest that section 1805 (1) was expected to limit the distribution of the tax burden *within* the class of residential taxpayers, or to hamstring a special assessment unit from curing inequities within this class. Indeed, there is evidence in the record, which petitioners never disputed with evidence (as opposed to assertions), that what the County did here reflected a settled understanding of section 1805 (1)—that New York City, the only other special assessing unit in the state, lowered its class one fractional assessment percentage from 28% to 8% over a period of time in order to bring assessed values for residential taxpayers in line with market values, just as the County did here.

Next, throughout the legislative debate discussion of "assessments" referred to fractional assessments. In particular, section 1805 (1) applied only to the County and New York City, both of which had historically assessed property at percentages of market value (*see* discussion at 255-256, *supra*; Willis, *Tax Certiorari Proceedings and the Present Real Property Tax System in New York City*, 9 Fordham Urb LJ 591 [1980-1981]). Since the statute was intended to permit them to continue this practice, it makes little sense to read this provision as referring to market value rather than fractional assessment. In addition, as the County points out, in 1981 the only "assessment" of a property that appeared on the assessment roll was its fractional assessed value (*see* RPTL 502 [3] [1981], as enacted by L 1958, ch 959). The Legislature did not amend section 502 (3) to require disclosure on the roll of a parcel's "full value" as well as its assessed valuation until 1999 (*see* L 1999, ch 611). Along the same lines, many statutes enacted by the Legislature since 1981 recognize the distinction between "assessed value" and "market value" (*see e.g.* RPTL 1803-a [2] [a] [1]; [b] [1]; [3] [b] [1]; 701 [8] [b]; 922 [1] [a] [iii]).

Petitioners rely on Real Property Tax Law § 102 (2) to equate assessment with full value. As the Appellate Division observed, however, this provision defines assessment as

> " 'a determination made by assessors of . . . the *valuation* of real property' (emphasis added) not the full market value of the property. In other places, when the term full value or full market value is used in the RPTL (*see e.g.* RPTL 305, 502 [3]) it juxtaposes that to the terms 'assessed valuation' or 'total assessed valuation.' Were the petitioners correct, there would be no need to use all of these terms. The statute could have used only full market value" (31 AD3d at 82).

Finally, the dissent protests that we have allowed the County to exploit a loophole in section 1805 (1) whereby the County "leave[s] Mrs. Jones's assessment the same, cut[s] everyone else's assessment in half, and double[s] the tax rate. Now everyone pays the same tax as last year except for Mrs. Jones, who pays double" (dissenting op at 261). What the dissent fails to point out, however, is that this is so only if the full market value of Mrs. Jones's house has doubled over time while the full market value of everyone else's house has not, yet Mrs. Jones and everyone else have all been paying the same property taxes

because their fractional assessments have remained the same. Thus, Mrs. Jones has for some time been paying less than her equitable share of the residential portion of the tax levy. We do not mean to minimize the hypothetical Mrs. Jones's hardship when her taxes doubled in a single year, but the dissent would have us rewrite section 1805 (1) so as to preclude the County from doing what it did here: bring assessed values in line with market values over three years in order to reduce accumulated and significant tax disparities between poorer and more affluent residential areas, without changing the tax burden of the residential class as a whole.

Accordingly, in each case the order of the Appellate Division should be affirmed, with costs.

SMITH, J. (dissenting). I agree with Justices Spolzino and Lifson, dissenting in the Appellate Division, that the interpretation of RPTL 1805 (1) advanced by Nassau County, and now adopted by the majority of this Court, eviscerates the statute.

Section 1805 (1) says:

> "The assessor of any special assessing unit shall not increase the assessment of any individual parcel classified in class one in any one year, as measured from the assessment on the previous year's assessment roll, by more than six percent and shall not increase such assessment by more than twenty percent in any five-year period."

The purpose of the statute could not be clearer: It is to protect property owners from tax increases by limiting increases in their assessments. The protection is not absolute, of course. It is possible to increase taxes without increasing assessments—by increasing tax rates. But since tax rates are the same for everyone, a jurisdiction subject to section 1805 (1) cannot increase the tax on, say, Mrs. Jones's house by more than six percent in one year unless it increases everyone else's taxes too.

That, at least, is what the Legislature evidently thought when it enacted section 1805 (1). But Nassau County thinks it has discovered a way around the statute: Just leave Mrs. Jones's assessment the same, cut everyone else's assessment in half, and double the tax rate. Now everyone pays the same tax as last year except for Mrs. Jones, who pays double. Incredibly, the majority today holds that this gimmick works. Section 1805 (1) is as useless as if it had never been passed.

To uphold what the County has done the majority must first decide that "assessment" in the statute does not mean "as-

sessed value"—the actual value of the property as determined by the assessor—but "fractional assessment"—the amount obtained after assessed value is multiplied by a percentage. The key, of course, is that the assessed value cannot be changed arbitrarily, but the percentage used to multiply it, and thus the fractional assessment, can be.

The term "assessment" can be used to mean either assessed value or fractional assessment, and indeed is used in both senses in the Real Property Tax Law. RPTL 701 (4) (a) defines "excessive assessment" to mean "an entry on an assessment roll . . . which exceeds the full value of real property"; RPTL 701 (8) (b) defines "unequal assessment" to mean "an entry on the assessment roll . . . made at a higher proportionate valuation than the assessed valuation of other real property in the same class . . . ." Obviously, "assessment" is used to mean assessed value in the first of these statutes, and fractional assessment in the second. If we must choose between the two definitions in interpreting RPTL 1805 (1), we should choose the one that prevents an assessing jurisdiction from frustrating the purpose of the statute.

But we do not even have to choose. Assume for the sake of argument that "assessment" means fractional assessment; the statute still requires that any increase in assessment be "measured from the assessment on the previous year's assessment roll." Can anyone doubt that what the Legislature intended was a meaningful year-to-year comparison, not a meaningless one? But the comparison is meaningless unless the percentage used to determine the fractional assessment is held constant from year to year. In other words, if the statute requires comparing fractional assessments, it must require a comparison of fractional assessments obtained by using the same fraction for each year. To hold otherwise is to license blatant evasion. It is as though a statute provided that Nassau County's budget could not increase by more than six percent from year to year, and Nassau County had sought to comply by stating the first year's budget in dollars and the second year's in British pounds.

The majority opinion, for understandable reasons, never addresses the absurdity that results from its reading of RPTL 1805 (1). The majority does not even suggest that the statute, as it has now been interpreted, can effectively serve any function whatever. Instead, the majority spends considerable space on subjects irrelevant to the issue we have to decide.

Thus, our decision in *Matter of Hellerstein v Assessor of Town of Islip* (37 NY2d 1 [1975]) is indeed an important milestone in the history of New York real property taxation, and it is quite true that RPTL article 18, in which section 1805 (1) is contained, was part of the reaction to that decision (majority op at 252-256). It is also true that the Legislature that passed article 18 was much concerned with the allocation of taxes between classes of property—specifically, businesses and homes (*id.* at 259). But I do not see how any of this is of the slightest help in deciding this case. Section 1805 (1) says nothing about the allocation of tax burdens between classes. Its explicit and only subject is "the assessment of any individual parcel classified in class one"; the other classes are unmentioned. If, as the majority suggests, the legislators of New York had no desire to "limit the distribution of the tax burden *within* the class of residential taxpayers" (majority op at 259), what on earth did they pass this statute for?

Nor is it relevant that petitioners here did not protest sooner than they did against what the County has done to them. The majority says that "[n]one of the petitioners appeared at the approval hearing for the new assessment roll, or submitted comments to Supreme Court to oppose its adoption" (*id.* at 258); it also says that the *Coleman* class action litigation was "widely reported" (*id.* at 256). But the record does not indicate that petitioners were parties to or were ever asked for their views in the *Coleman* case, or that they knew or should have known that, as part of the settlement, a state statute was being tossed aside. It is undisputed that petitioners had no obligation to raise the issues they now raise at any earlier time. There is no basis for a laches argument here, and the majority does not say there is. The majority's comments about petitioners' inactivity are pure atmosphere.

The majority notes that the settlement of the *Coleman* litigation is the "mainspring" of this case (*id.*). It is indeed. In their efforts to settle the *Coleman* case, the parties to that case, and the court before which it was pending, found RPTL 1805 (1) to be a serious inconvenience. In an order approving, with some modifications, the tax roll that resulted from this settlement, Supreme Court spoke with surprising candor: "A difficulty arises . . . because RPTL 1805 prohibits assessment increases of more than 6% for any individual parcel in any one year. Application of this statutory ceiling to under-assessed properties would thus frustrate the very clear purposes of the [settlement]."

Rather than allow the statute to "frustrate" their "purposes," the *Coleman* parties and court decided to nullify it. Unfortunately, this Court has now approved their effort. Part of the problem, of course, is that the *Coleman* settlement has already been implemented, at great trouble and expense. I can understand the majority's reluctance to hold that a countywide reassessment of "368,043 residential . . . parcels over a three-year period at a cost of roughly $35 million" (majority op at 258) was illegal. But I would not accept Nassau County's invitation to pull it out of the hole it has dug for itself. If it needs rescuing, it should turn to the Legislature.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO and PIGOTT concur with Judge READ; Judge SMITH dissents in a separate opinion; Judge JONES taking no part.

In each case: Order affirmed, with costs.