# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 1
Tax Equity Now NY LLC,
    Appellant,
        v.
City of New York et al.,
    Respondents,
State of New York et al.,
    Respondents.

Richard P. Bress, for appellant.
Edan C. Burkett, for respondents City of New York et al.
Mark S. Grube, for respondents State of New York et al.
Citizens Budget Commission, LatinoJustice PRLDEF, National Association for the Advancement of Colored People New York State Conference, amici curiae.

RIVERA, J.:

Plaintiff Tax Equity Now NY, LLC (TENNY) challenges New York City's property-tax system, alleging that the system imposes substantially unequal tax bills on similarly-valued properties that bear little relationship to the properties' fair market value. According to the complaint, the result is staggering inequities and a regressive tax system that hurts those who can least afford to pay heavy taxes. The complaint further alleges that multi-million-dollar properties are taxed at similar or lower rates than less valuable

properties and that real property in majority-people-of-color districts are overassessed and subjected to higher taxes compared to properties in majority-white districts. TENNY seeks declaratory and injunctive relief against City and State defendants for alleged constitutional and statutory violations caused by the City's tax scheme. Despite the comprehensive, detailed allegations and legal precedent supporting the causes of action, the Appellate Division dismissed the complaint in its entirety at the pleading stage for failure to state any claim. That was error.

A pleading need only allege facts that "fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87 [1994]). As we have long emphasized, because the standard is intended to provide notice of a claim, at this stage of the proceeding we assume all facts alleged as true and draw all possible inferences therefrom (*see id.* at 87-88). Thus, the question is not whether a party will eventually prove its claim once those allegations are put to the test but whether the claim is based on a viable legal theory (*see Chanko v American Broadcasting Cos. Inc.*, 27 NY3d 46, 52 [2016]). Applying that standard here, we conclude that, although TENNY's complaint failed to state claims against the State defendants, the complaint exceeds our pleading standard and sufficiently alleges causes of action against the City defendants under section 305 (2) of Real Property Tax Law (RPTL) and the federal Fair Housing Act (FHA) (42 USC § 3601 et seq) on the general basis that the system is unfair, inequitable and has a discriminatory disparate impact on certain protected classes of New York City property owners. Accordingly, we modify the Appellate Division's order as to these causes of action.

I.

New York City's Real Property Taxation Scheme

In 1981, the legislature, over the Governor's veto, enacted Article 18 of the RPTL (*see* L 1981, ch 1057), which reformed the State's property tax scheme in response to the Court's decision in *Matter of Hellerstein v Assessor of Town of Islip*, where the Court held that then-existing state law required the assessment of real property for tax purposes at its full market value (37 NY2d 1 [1975]). Pre-*Hellerstein,* localities operated under fractional assessment regimes that often assessed commercial and industrial property at higher ratios of assessed value over market value than they did for residential property (*see Matter of O'Shea v Board of Assessors of Nassau County,* 8 NY3d 249, 252-253 [2007]). Prior to the 1981 reforms, there was "widespread fear" that *Hellerstein* would shift "a significant portion of the property tax burden from businesses to homeowners" (*id.* at 253). The reforms repealed a provision of the RPTL that had required full value assessment, added section 305 (2), a new provision specifying that "[a]ll real property in each assessing unit shall be assessed at a uniform percentage of value (fractional assessment)" (RPTL 305 [2]), and added a new Article 18 which established "special assessing units," which includes New York City (RPTL 1801 [a]).

Article 18 of the RPTL established four classes of real property in the City. Class One consists of one-, two-, and three-family residential property. Class Two contains all other residential property, including condominiums, cooperatives and rental buildings. Utility property makes up Class Three and all other real property is designated as Class Four (*see* RPTL 1801 [a], 1802 [1]). The City's total property tax burden is allocated

among these four classes (Budget Report on Bills, at 1, Bill Jacket, L 1981, ch 1057).

Section 581 of the RPTL provides that "real property owned or leased by a cooperative

corporation or on a condominium basis shall be assessed . . . at a sum not exceeding the

assessment which would be placed upon such parcel were the parcel not owned or leased

by a cooperative corporation or on a condominium basis" (RPTL 581 [1] [a]). Thus,

condominium and cooperative buildings are assessed as if they were rental properties.

The formula for determining the proportion of all real property taxes owed by each

class is expressed in RPTL 1803-a, which also includes caps on the annual amount the

class share for each class may increase relative to the total property tax burden of the City

(*see* RPTL 1803-a). Section 1805 caps the assessed value increase of certain individual

parcels. Class One property assessments may not increase more than 6% in any one year

or more than 20% in any five-year period (*see* RPTL 1805 [1]). Assessment of a Class Two

property with fewer than 11 residential units may not increase more than 8% in any one

year or more than 30% in a five-year period (*see* RPTL 1805 [2]). Assessment of Class

Two properties with 11 or more units are not limited but increases must be phased in over

a five-year period (*see* RPTL 1805 [3]).

In addition to the RPTL 1803-a caps on increases by property class and RPTL 1805

caps on assessment increases, the final tax bill for individual properties may be further

reduced by applicable abatements or exemptions. For example, RPTL 467-a provides a

partial tax abatement for eligible condominium and cooperative owners (*see* RPTL 467-a).

To comply with this statutory framework, the New York City Department of

Finance (DOF) first determines a parcel's taxable value by estimating its full fair market

value, which is calculated by application of a multifactor mathematical formula.[1] DOF then multiplies that market value by the fractional assessment rate for that parcel's property class—Class One properties at 6% of the parcel's market value and all other classes at 45% of market value, subject to the RPTL 1805 assessment caps. For example, a Class One property estimated at a $100,000 market value would have a $6,000 taxable value (100,000 x 6% = 6,000) and a Class One property with a $200,000 estimated market value would have a $12,000 taxable value (200,000 x 6% = 12,000). DOF then multiplies the taxable value of the property by the current tax rate for that property's class. The tax rate is a proportional rate based upon each class's RPTL 1803-a share of that class's tax burden— determined by the RPTL 1803-a statutory formula. This calculation results in the individual property owner's tax obligation. That amount is then adjusted based on any applicable State and City statutory and regulatory exemptions and abatements (e.g., Rules of the City of New York § 5-06 [providing tax exemption and abatement for residential rehabilitation or conversion to multiple dwellings]; *id.* § 50-01 *et seq.* [providing partial property tax reduction for condominium and co-op owners]; RPTL 425 [providing qualifying

---

[1] Among such factors for Class One are capital improvements to the property as well as recent sales of similar properties in the neighborhood, and for Class Two, the parcel's "income producing potential" (*see* Department of Finance, *NYC Residential Property Taxes: Class One* (FY 2025) at 3, *available at* https://www.nyc.gov/assets/finance/downloads/pdf/brochures/class_1_guide.pdf [last accessed Feb 20, 2024]; (Department of Finance, *NYC Residential Property Taxes: Class Two* (FY 2025) at 3, *available at* https://www.nyc.gov/assets/finance/downloads/pdf/brochures/class_2_guide.pdf [last accessed Feb 20, 2024]).

homeowners partial relief from local education taxes]). This adjusted amount is then billed to the property owner.

As obvious from this summary, the City's real property tax assessment system is complex and reflects policies favoring certain types of property. While the City's assessments are subject to the state's RPTL statutory limitations that protect homeowners from drastic increases in property taxes from year to year, the RPTL allows the City to make certain discretionary adjustments to address inequities and avoid unlawful treatment of similarly situated-properties (*see O'Shea*, 8 NY3d at 259).

II.

Factual and Procedural History

TENNY "is an association committed to pursuing legal and political reform to address the inequity and illegality of New York City's property tax system." TENNY's members include real property owners and renters and organizations committed to economic justice. In 2017, TENNY filed the underlying complaint for injunctive and declaratory relief against defendants City of New York and DOF (referred jointly as the City), and the State of New York and the State Office of Real Property Tax Services (referred jointly as the State).

The complaint alleges that the City's tax system is inequitable, and that taxation is not based on fair-market value as required by both the State Constitution and the RPTL. It further claims that the system has discriminatory disparate impact. The complaint asserts 16 causes of action for violations of: (1) Article XVI, section 2 of the State Constitution;

(2) RPTL 305 (2); (4) the State and Federal Equal Protection Clauses; (5) the State and Federal Due Process Clauses; and (6) the FHA. The complaint comprehensively describes the taxation methodology applied to real property within the City and alleges that publicly-criticized systemic inequities have resulted in million-dollar properties increasingly shouldering less of a tax burden than properties worth far less. The complaint alleges that the system is illegal because it violates the statutory and constitutional mandate that property taxes be imposed uniformly within each property class and "reflect a fair and realistic value of the property involved so that all property owners contribute equitably to the public fisc." The complaint also claims that the taxation system has a disproportionate discriminatory impact and perpetuates housing segregation in the City in violation of the FHA. The complaint includes examples to illustrate the alleged unfair tax consequences of the taxation scheme and its racially-disparate impact on the City's real property owners and diverse neighborhoods. The complaint further alleges that TENNY's members have suffered a specific harm because their properties are taxed at arbitrary and disproportionate rates compared to property within and outside their property classification.

The City and State separately moved to dismiss the complaint on several grounds, including, as relevant to this appeal, for failure to state a claim under CPLR 3211 (7). Supreme Court denied the City's motion but granted the State's motion as to all but the RPTL 305 (2), FHA, and state and federal due process claims, concluding, in part, that these were adequately pleaded. Defendants separately appealed and TENNY cross-appealed.

The Appellate Division granted the City's motion to dismiss and the State's motion as to the two remaining causes of action and dismissed the complaint in its entirety (182 AD3d 148 [1st Dept 2020]).[2] The court held that TENNY failed to state either an equal protection or due process challenge to RPTL 1805 (1)'s assessment caps and RPTL 581's treatment of all Class Two properties as rental property because those measures are rationally-related to the government's interests in promoting home ownership and shielding homeowners whose properties rapidly appreciate from dramatic tax increases, and do not constitute invidious discrimination (*see id.* at 158-165). The court also rejected TENNY's claims under Article XVI, § 2, holding this provision only "requires the State to have a process in place for the adjustment and review of assessments of individual taxpayers" and that the State met this constitutional requirement (*id.* at 162-163). TENNY's RPTL 305 (2) claim was dismissed because that section "must be read together and applied harmoniously" with RPTL 1805's assessment caps, which the legislature "knew that, over time, . . . were going to necessarily create disparities" and therefore could not have intended to run afoul of RPTL 305 (2) (*see id.* at 164). The court further concluded that TENNY did not state a claim under RPTL 1802 (1) because, while it establishes four classes of real property in New York City, it "does not limit the number of permissible classifications to those four" (*id.* at 165). Finally, the court held that TENNY failed to state a claim under the FHA because: (1) property tax assessments do not constitute a term or

---

[2] The Appellate Division rejected defendants' arguments that TENNY lacked standing (*see* 182 AD3d at 156). The parties do not challenge that determination before us.

condition of sale under 42 USC § 3604 (b); and (2) the complaint did not plead a "robust causality" between the property tax system and continued patterns of segregation. (*see id.* at 166-168).

We dismissed TENNY's appeal as of right under CPLR 5601 (b) (1) for lack of a substantial constitutional question (35 NY3d 1077 [2020]) and the Appellate Division denied TENNY leave to appeal to this Court. Thereafter, we granted TENNY's motion for leave to appeal (38 NY3d 906 [2022]). We now conclude that the complaint sufficiently pleads violations of RPTL 305 (2) and the FHA against the City and that the remaining causes of action against the City and State were properly dismissed for failure to state a claim.

III.

A.

Liberal Pleading Standard

On a CPLR 3211 (a) (7) motion to dismiss for failure to state a cause of action, the Court affords the pleading "a liberal construction" (*Leon*, 84 NY2d at 87). "We accept the facts as alleged in the complaint as true, accord plaintiff[] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*id.* at 87-88); *see also 34-06 73, LLC v Seneca Ins. Co.*, 39 NY3d 44, 51 [2022]). The only question is whether the complaint adequately alleges facts giving rise to a cause of action, "not whether [it] properly labeled or artfully stated one" (*Chanko*, 27 NY3d at 52). Thus, "[w]hether a plaintiff can ultimately establish its allegations is not

part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v. Goldman, Sachs & Co.,* 5 NY3d 11, 19 [2005]; *see also Sassi v Mobile Life Support Services, Inc.*, 37 NY3d 236, 239 [2021]). The court must review each cause of action separately to determine its viability and may dismiss only those which fail as a matter of law (*see* CPLR 3211 [a]) ["A party may move for judgment dismissing one or more causes of action asserted against (them)"]). New York's liberal pleading standard requires only that the nonmovant be placed on notice of the legal claim asserted.

We address initially those statutory-based causes of action against the City that are sufficiently pleaded and then explain why the remaining causes of action were properly dismissed. We then turn to TENNY's claims against the State.

B.

Causes of Action Against the City

1.

RPTL 305(2)

The second and sixth causes of action allege that the City's real property taxation scheme violates RPTL 305 (2) based on intraclass disparate assessment and taxation within Class One and Class Two, respectively. Section 305 (2) of the RPTL provides that "[a]ll real property in each assessing unit shall be assessed at a uniform percentage of value (fractional assessment)" (RPTL 305 [2]). Thus, because under RPTL 1802 New York City is a special assessment unit divided into four classes, the assessor must apply the same fractional value to *each property within the same class* (*see Matter of O'Shea*, 8 NY3d at 254, 260; *Colt Indus., Inc. v Financial Adm'r of New York*, 54 NY2d 533, 544-545 [1982]).

"To comply with these statewide mandates of the [RPTL], cities calculate real property taxes by determining the full value of each parcel, fixing the ratio of full value to assessed value in each class, and, finally, applying a uniform tax rate for each class of property to the assessed value producing the tax due" (*41 Kew Gardens Rd. Assoc. v Tyburski*, 70 NY2d 325, 330 [1987]).

The complaint alleges that the City's assessment methods result in disparate tax burdens for Class One and Class Two properties of equivalent market value, both from borough to borough and within boroughs. In support, the complaint relies on the City's data, generated by the City's Independent Budget Office (IBO). By way of example, the complaint alleges that Class One properties in two Brooklyn boroughs are assessed at vastly different rates: Canarsie properties are assessed at over triple the rate of the same properties in Park Slope. The complaint alleges that this disparity is regressive and benefits wealthy taxpayers in neighborhoods with rapidly-increasing property values. In it, TENNY asserts that the Deputy Director of the IBO acknowledged this inequity in testimony before the State Assembly Committee on Real Property Taxation in January 2016, wherein he stated that the City's assessment methods "guarantee[ ] that similar properties will face widely different tax burdens depending on where they are located in the city." The complaint also refers to the head of DOF who was quoted in the press as acknowledging that the City's property-tax system is filled with "unfairness and inequity." TENNY alleges that these intraclass disparities "ensur[e] that older properties in faster-appreciating neighborhoods are assessed and taxed at a lower effective rate than other properties of identical market value."

The complaint visually depicts geographic disparities in fiscal year 2017. It includes charts setting forth: (1) the median ratios of assessed value to market value for Class One properties by borough; (2) effective tax rates for each borough and as a Citywide percentage; (3) different 2017 taxes owed; (4) 2017 ratios of assessed value to sales price for homes sold in 2015 at the same price of $750,000; and (5) average ratios of assessed value to market value, as well as the average effective tax rate for Class One properties by borough. The complaint alleges that the City can ameliorate the disparities and inequities by lowering the assessment ratio and raising the tax rate.

The complaint further alleges and describes that the most dramatic systemic disparities within Class Two stem from the City's assessment of cooperative and condominiums. The sixth cause of action alleges that this method of value assessment separately violates RPTL 305 (2) based on the City's interpretation and application of RPTL 581 (1). To comply with the RPTL 581 (1) (a) prohibition on different tax treatment based on cooperative or condominium status, the City taxes them as if they were rentals. The assessment methodology for these properties is undisputed: "[a]s a matter of [DOF] policy, all cooperative and condominium units constructed before 1974—a category that includes 98% of cooperative apartments in the City—are valued under the income approach by comparison to rental properties that were built before 1974" and, "[b]ecause of the City's rent stabilization laws, this effectively means that older cooperatives and condominiums are compared to buildings whose income is suppressed by rent stabilization, even though those cooperative and condominium units do not and could not qualify for rent stabilization and are, in fact, sold (and rented) at much higher market values."

According to the complaint, "[t]his causes large disparities in the valuation of and effective tax rates applicable to condominiums and cooperatives depending on whether they were built before or after 1973." The complaint cites publicly-available records which, according to the complaint, suggest that the City assesses some condominiums and cooperatives at values less than the selling price of a single unit in the same building. The complaint again refers to external sources to support its allegations. Among them is a 2015 report from a leading national real estate firm that more than 5,000 condominium units sold in Manhattan in December 2014 for an average price of $1,600 per square foot, but, as the complaint alleges, the City assessed them at $304 per square foot (Elliman Report, *Manhattan Decade: 2005-2014* (2015), *available at* http://www.millersamuel.com/files/2015/02/Manhattan_10YR_2014.pdf [last accessed Jan 27, 2024]). The complaint further alleges that, as a result of the City's interpretation of RPTL 581 (1) (a), "[t]he average renter within the same property class bears the expense of an effective tax rate over 66 times higher," citing a report from New York University's Furman Center (State of New York City's Housing and Neighborhoods 2011 [2011] at 8, *available at* http://furmancenter.org/files/sotc/SOC_2011.pdf [last accessed Jan 27, 2024]). The complaint also quotes the City Comptroller's 2012 audit report that DOF "did not properly follow its own Property Valuation Guidelines when selecting comparable properties" for Class Two cooperatives and condominiums (John C. Liu, *Audit Report on the Valuation of Class 2 Properties by the New York City Dept. of Finance* [Apr 12, 2012] at 15, *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/FN11_130.pdf [last accessed Jan 27, 2024]). As the complaint further alleges, DOF itself has admitted that when

comparable properties within the same neighborhood are not available, it relies on properties from another neighborhood even if the values are substantially different.

The City does not dispute TENNY's numbers or the claims of wide inter- and intra- class disparities, but instead responds that the law requires only uniform assessment—not a uniform effective tax rate—which the City defines as the ratio between a property's tax liability and the estimated market value. Put more simply, the City argues that properties with the same market value are not required to pay the same tax bill because of factors outside of the City's control, such as the application of state legislatively mandated caps and exemptions. The Appellate Division similarly concluded that TENNY failed to state a claim under RPTL 305 (2), reasoning that, since the RPTL 1805(1) caps on Class One Properties at 6% in one year or 20% over a 5-year period were passed during the same legislative session as RPTL 305 (2), the legislature could not have intended the disparities caused by RPTL 1805 to violate RPTL 305 (2) (*see* 182 AD3d at 163-164). This interpretation of the statute—adopted by our dissenting colleagues (*see* Garcia, J., dissenting op at 3-12; Cannataro, J., dissenting op at 2)—is contrary to the text, legislative history and this Court's precedent.

We construe the "RPTL as a whole, with its various sections considered together and with reference to each other" (*DCH Auto v Town of Mamaroneck*, 38 NY3d 278, 296 [2022] [internal quotation marks and alterations omitted]) in accordance with the principle that, as "an integrated statutory scheme, they must be considered as a whole, with each component viewed in relation to the others" (*Johnson v City of New York*, 38 NY3d 431, 441 [2022] [internal quotation marks omitted], citing McKinney's Cons Laws of NY, Book

1, Statutes § 97, Comment at 213-214, 216 ["(W)ords, phrases, and sentences of a statutory section should be interpreted with reference to the scheme of the entire section . . . and the meaning of a single section may not be determined by splitting it up into several parts"]). Thus, we must read RPTL 305 (2) and 1805 together and harmonize their legislative commands. In accordance with that interpretation, RPTL 1805 does not foreclose TENNY's claims but instead directs the City to ensure that its assessment is based on the property's fair market value. The conclusion in the dissents to the contrary is at odds with our prior analysis of RPTL 1805 (1) and the actions an assessment unit may undertake to address disparities—even when those disparities flow, at least in part, from the state-law-mandated caps.

In *O'Shea*, Nassau County settled pending litigation alleging, similar to TENNY here as against the City, that residential property assessments in the County were "completely divorced from current market value," and led to "poor and minority homeowners [ ] shouldering a disproportionate and discriminatory share of the countywide property tax burden," (8 NY3d at 255-256). "The only way for the County to comply with [its settlement obligations] was to lower the fraction by which every residential parcel's full market value was to be multiplied to fix the assessed value" (*id.* at 258). As a result, "the County limited the number of residential parcels with fractional assessments exceeding the six percent cap" (*id.* at 258-259). The Court rejected the residential property owners' claim that the County's plan and the resulting drastic tax experiences nullified RPTL 1805 (1) (*see id.* at 259-261).

The fact that *O'Shea* involved actions taken in furtherance of a negotiated settlement does not limit application of its analysis here because the *O'Shea* Court still interpreted the potential limitations of RPTL 1805 (1), not the settlement agreement. As the Court explained, there are no textual limitations on changes to the fractional assessment rate and the legislative changes that led to the enactment of, among other items, RPTL 305 (2) and Article 18 (*id.* at 259). The legislature enacted this reform package "in response to *Hellerstein*," and it "was principally aimed at protecting residential taxpayers from tax increases caused by tax shifts from businesses to homeowners as a result of revaluation, not tax increases driven by market forces" (*id.*).

The legislative history puts to rest any doubt concerning the interaction between these provisions of the RPTL. As the *O'Shea* Court explained, the legislative history "does not in any way suggest that section 1805 (1) was expected to limit the distribution of the tax burden *within* the class of residential taxpayers, or to hamstring a special assessment unit from curing inequities with this class" (*id.*). Critically, the Court noted that Nassau County, complying with the negotiated settlement, had "lower[ed] the fraction by which every residential parcel's full market value was to be multiplied to fix the assessed value" in a manner consistent with "a settled understanding of RPTL 1805 (1)" shared by New York City at the time, which had previously "lowered its class one fractional assessment percentage from 28% to 8% over a period of time in order to bring assessed values for residential taxpayers in line with market values" (*id.* at 258-259). *O'Shea* makes clear that RPTL does not limit the City's authority to take action, as it has in the past, to achieve an

alignment between assessed and market values that ameliorates disparate tax burdens. It is only a question of the City's willingness to do so.

Our dissenting colleagues reach this erroneous conclusion by dividing this unitary scheme into two separate parts before purportedly demonstrating the City's compliance with each, while completely ignoring the City's exclusive and critical role in setting the target assessment ratio—the percentage of market value the City aims to capture in the assessment (*see* Garcia, J., dissenting op at 3-6). However, this bifurcated approach both defies established canons of construction and disrupts the scheme's interlocking components. The City must comply with RPTL 305 (2)'s requirement that properties be "assessed at a uniform percentage of value" while also accounting for RPTL 1805's assessment caps (*see Johnson*, 38 NY3d at 441). Those caps limit the increase in fair market value reflected in the taxable value of the property (currently 6% over the prior tax year), resulting in an assessment value that is below fair market value.[3] This results in assessments at disuniform percentages of market value and, downstream, properties with faster-appreciating market values shouldering less of the tax burden than properties with less-rapidly-appreciating market values.

For example, assume Class One parcel A estimated to have a fair market value of $100,000 in year one and the following year its fair market value is estimated to have

---

[3] Judge Garcia's dissent mistakes our reading of RPTL 305 (2) as an application of the assessment caps prior to the uniform assessment required under RPTL 305 (2) (*see* Garcia, J., dissenting op. at 7-8). We here *account for* the inequities that spring from RPTL 1805 (1)'s assessment caps and other exclusions. Consistent with our precedents (*see e.g. Johnson*, 38 NY3d at 441), we read these provisions *together*, not in succession.

increased 15%, so that it is now worth $115,000. If the City applies its 6% fractional assessment multiplier to arrive at the property's taxable value the property's assessed value would be $6,000 during the first year and $6,900 during the second year without the cap, but it would be $6,360 once the cap is applied. Now, assume Class One parcel B valued at $100,000 during year one increases only 6% in fair market value to $106,000 the following year. If the City applies the same 6% fractional assessment multiplier, then this property's assessed value would be $6,000 during the first year and $6,360 during the second year without the cap, but it would be the same value once the cap is applied because the increase was equivalent to the cap amount. As this example makes clear, application of the 6% assessment ratio along with the assessment cap results in an actual tax assessment ratio that is not "assessed at a uniform percentage of value" and which becomes increasingly out of sync with market values as certain similarly-situated properties appreciate more rapidly than others. The following charts depict this effect:

### Year #1

| Parcel | Market Value | Target Assessment Ratio | Assessed (Taxable) Value | Actual Assessment Ratio (When Cap Applied) |
|--------|--------------|-------------------------|--------------------------|---------------------------------------------|
| A | $100,000 | 6% | $6,000 | 6% |
| B | $100,000 | 6% | $6,000 | 6% |

### Year #2

| Parcel | Market Value | Target Assessment Ratio | Assessed (Taxable) Value with 6% Increase Cap | Actual Assessment Ratio (When Cap Applied) |
|--------|--------------|-------------------------|-----------------------------------------------|---------------------------------------------|
| A | $115,000 | 6% | $6,360 | 5.530% |
| B | $106,000 | 6% | $6,360 | 6.000% |

Contrary to the view of our dissenting colleagues—a consequence of its misinterpretation of the text and legislative history—the RPTL authorizes the City to avoid these disparities and the unlawful inequitable tax burden imposed on certain property owners. The view in Judge Garcia's dissent—based on selective quotes from the legislative record—that the drafters of Article 18 passed it with full knowledge of the disparities it supposedly would leave unaddressed (*see* Garcia, J., dissenting op at 9-11), is as unpersuasive now as when the Court rejected it in *O'Shea*. The view of our dissenting colleagues here is basically an amalgamation of the *O'Shea* dissent and the dissents in the Appellate Division there (*see* 8 NY3d at 261 [Smith, J., dissenting] ["(A) jurisdiction subject to section 1805 (1) cannot increase the tax on, say, Mrs. Jones's house by more than six percent in one year unless it increases everyone else's taxes too. That, at least, is

what the Legislature evidently thought when it enacted section 1805 (1)"]; *Matter of Briffel v County of Nassau*, 31 AD3d 79, 86 [2d Dept 2006] [Spolzino, J., dissenting]; *id.* at 97 [Lifson, J., dissenting]).[4] Even worse, the dissents here, unlike the dissent in *O'Shea* (*see id.*), ignore that the statutory framework was intended to avoid spikes in property taxes due to shifts from business to homeowners. It was not intended, as the dissents seem to assume, to permit assessments by the City that ignore disparities created by market forces (i.e., spikes in market value). It is possible to both prevent the type of "shock" to residential property taxpayers from an unanticipated large increase in their property's market value and corresponding tax bill—the legislature's animating concern—while also accounting for increases in market values within the same class by adjusting the City's fractional assessment rate based on how the statutory caps suppress the fair market estimate later in the tax process. Unlike the dissents, which erroneously conclude that RPTL 305 (2) does not require the City to take this route (Garcia, J., dissenting op at 8; Cannataro, J. dissenting op at 2), we hold that it does.

---

[4] Judge Garcia's dissent correctly observes that, dissenting in *O'Shea*, Judge Smith read "the assessment referenced in section 1805 (1)" as requiring "that the 'percentage used to determine the fractional assessment' must be 'held constant from year to year' to effectuate the purpose of that law" (Garcia, J., dissenting op at 8 n 2, quoting 8 NY3d at 262 [Smith, J., dissenting]). But the dissent here ignores its critical context, namely the *O'Shea* dissent's broader position that Nassau County had unlawfully changed the percentage used to calculate the assessed value—a position that failed to garner a majority (*see O'Shea*, 8 NY3d at 262-264 [Smith, J., dissenting]). Judge Smith's understanding of course mirrored that of the Appellate Division dissenters in *O'Shea* and its companion cases—a view that, failed to garner a majority in that court as well (*see Matter of Briffel v County of Nassau*, 31 AD3d 79, 92-97 [2d Dept 2006] [Spolzino, J., dissenting]; *id.* at 97-99 [Lifson, J., dissenting]).

Returning to hypothetical Parcels A and B discussed above, assume that, in the second tax year, the City lowered its target assessment ratio from 6% to 5%, as the law authorizes. This would result in Parcel A having an assessed value of $5,750, while Parcel B would have an assessed value of $5,300. The result is that each property would bear a consistent tax burden in proportion to its prevailing market value for the tax year (and, thus, accounting for the artificial value resulting from the tax cap). The following chart depicts the assessment the RPTL requires:

**Year #2 with Reduced Target Assessment Ratios**

| Parcel | Market Value | Target Assessment Ratio | Assessed (Taxable) Value with 6% Increase Cap | Actual Assessment Ratio (When Cap Applied) |
|--------|--------------|-------------------------|-----------------------------------------------|--------------------------------------------|
| A | $115,000 | 5% | $5,750 | 5% |
| B | $106,000 | 5% | $5,300 | 5% |

The complaint's allegation that the City violates RPTL 305 (2) by using inappropriate comparison rentals to assess Class Two cooperatives and condominiums also has a basis in law (*see Leon*, 84 NY2d at 87-88; *Chanko*, 27 NY3d at 52). The City contends that RPTL 581 requires it to assess these properties as if they were rentals and thus cannot be liable for any disparities that result from such comparison. Section 581 of the RPTL prohibits different treatment based on the ownership of the unit (*see Matter of D.S. Alamo Assoc. v Commissioner of Fin. of the City of N.Y.*, 71 NY2d 340, 347 [1988]). The Court held in *Matter of Greentree at Lynbrook Condominium No. 1 v Board of Assessors of Vil. Of Lynbrook* that "the plain text of [RPTL] 581 mandates that the condominium [and cooperative] status of the subject properties be disregarded for tax assessment purposes,

and that the properties be assessed 'at a sum not exceeding the assessment which would be placed upon such parcel were the parcel not owned . . . on a condominium basis" (81 NY2d 1036, 1039 [1993]). As such, "the properties are to be assessed as if they were rental properties"(*id.*).

Contrary to the City's claim, *Greentree*'s observation that the properties at issue there had to be assessed as if they were rent stabilized is not an immutable proposition that must be applied in all cases. Instead, it reflects the fact that all the rentals in the assessing unit at issue in *Greentree* were rent stabilized. In fact, most of New York City's rentals are *not* rent stabilized.[5] Nothing in the plain text of RPTL 581 requires municipalities to assess a luxury condominium or cooperative as if it were a regulated apartment where the properties differ in meaningful ways. Instead, the RPTL requires municipalities to treat condominiums and cooperatives like other similarly situated rentals. Therefore, to the extent that condominium and cooperative properties would not be subject to rent stabilization if they were not held in ownership, the proper comparable is a non-rent-regulated unit. Therefore, claims that the comparisons are inapt and produce unlawful disparities, are sufficient to survive the motion to dismiss.

---

[5] According to a 2017 survey conducted by the New York City Department of Housing Preservation and Development, 55% of the City's housing stock is not rent-stabilized (*see* C.R. Waickman, J.B.R. Jerome, and R. Place, Report by New York City Dept. of Hous. and Urban Dev., *Sociodemograhics of Rent Stabilized Tenants: An Analysis Based on the 2017 New York City Housing and Vacancy Survey (NYCHVS)* [2018] at 1, *available at* https://www.nyc.gov/assets/hpd/downloads/pdfs/services/rent-regulation-memo-1.pdf [last accessed Jan 27, 2024]).

In sum, the complaint's allegations, supported with independent studies and the City's own data of widening disparities resulting from its annually-repeated assessment methodology to Class One and Two properties, sufficiently plead violations of RPTL 305 (2) against the City. Therefore, the second and sixth causes of action should not have been dismissed.

## 2.

### FHA

The complaint also sufficiently pleads three causes of action against the City under the FHA based on a disparate impact theory. The fourteenth cause of action alleges that the disparities described throughout the complaint disproportionately burden racial minorities compared to whites, in violation of the FHA (42 USC § 3601 et seq). In support of these allegations, the complaint provides data and uses examples to illustrate the disparities.[6]

---

[6] The complaint presents in percentage terms the latest Census data breaking down by borough the City's population in housing units by race and ethnicity as follows:

| RACE BY HOUSEHOLD AND PROPERTY TYPE BY BOROUGH | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Renters | | Conventional Homes | | Private Cooperatives | | Condominiums | |
| | White | Non-White | White | Non-White | White | Non-White | White | Non-White |
| Manhattan | 41.3% | 58.7% | 48.6% | 51.4% | 70.% | 30.0% | 68.3% | 31.7% |
| Bronx | 6.6% | 93.4% | 20.8% | 79.2% | 42.7% | 57.3% | 7.4% | 92.6% |
| Kings | 32.5% | 67.5% | 39.1% | 60.9% | 58.3% | 41.7% | 55.0% | 45.0% |
| Queens | 21.4% | 78.6% | 28.7% | 71.3% | 46.8% | 53.2% | 36.4% | 63.6% |
| Staten Island | 43.0% | 57.0% | 71.4% | 28.6% | 58.4% | 41.6% | 77.4% | 22.6% |
| Citywide | 35.6% | 64.4% | 47.7% | 52.3% | 67.0% | 33.0% | 59.7% | 40.3% |

(*see* United States Census Bureau, *Series VIIB: Population Households All Occupied Housing by Tenure* [2014], Table 94, *available at* https://www.census.gov/data/ tables/time-series/demo/nychvs/series-7b.html [last accessed Jan 27, 2024]).

Specifically, the complaint alleges that property owned in Class One supermajority-minority community districts pay higher tax rates than those in supermajority white districts— property in super-majority non-white districts are assessed at a 20% higher tax rate than supermajority-white districts, and majority-minority community districts are assessed at a rate 13% higher than the rate applied to majority white community districts. According to the complaint, the higher tax bills inhibit mobility and place a disproportionate burden on the purchase, ownership and renting of Class One properties, in violation of the FHA's prohibition on race-based discrimination.

The fifteenth cause of action asserts that the City's tax policy favors Class Two owner-occupied housing, including condominiums and cooperatives, over Class Two rental property. Further, it alleges that the disparities in rental unit tax assessments are discriminatory and fall most heavily on minority renters in the City and impacts their search for affordable housing, in violation of 42 USC § 3604 (a). TENNY alleges, with respect to Class Two properties, that the City's tax scheme and the assessment caps have a disproportionate racial impact. The complaint alleges that renters are disproportionately people of color and that renters pay higher rents to cover the taxes building owners pass onto them as part of the rent. Rental building owners, the complaint further alleges, pay a higher effective tax rate than condominium and cooperative owners, who are disproportionately white, and that this disparate impact violates the FHA. These are sufficient allegations to survive dismissal.

The FHA provides, in relevant part, that "it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin[; and]

(b) [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin" (42 USC § 3604 [a]-[b]).

The animating policy of the FHA "is to provide, within constitutional limitations, for fair housing throughout the United States" (42 USC § 3601). And the United States Supreme Court has "acknowledge[d] the Fair Housing Act's continuing role in moving the Nation toward a more integrated society" (*Texas Dept. of Hous. and Community Affairs v Inclusive Communities Project, Inc.* ["*ICP*"], 576 US 519, 547 [2015]). To that end, both intentional discrimination and disparate impact claims are cognizable under the FHA (*id.* at 539-540), which prohibits state and local laws and governmental practices that discriminate based on the protected classifications (*see e.g. Mhany Mgt., Inc. v County of Nassau*, 819 F3d 581, 605-620 [2d Cir 2016] [holding that a village violated the FHA when it re-zoned property in a manner that disparately impacted members of racial minority groups and, based on the village's "knowledge of their constituents' discriminatory animus(,)" also did so with "discriminatory intent"]; *Huntington Branch, N.A.A.C.P. v Town of Huntington*, 844 F2d 926, 937 [2d Cir 1988] [same when municipality refused to amend a zoning ordinance to permit construction of multifamily homes beyond an urban renewal area] *affd in part sub nom. Town of Huntington, N.Y. v Huntington Branch, N.A.A.C.P.*, 488 US 15 [1988]).

The complaint alleges, again relying on hard data, that the City's assessment and taxation practices have an FHA-prohibited discriminatory disparate impact. According to the complaint, the City drastically over-assesses and over-taxes majority-minority communities and the properties in which minorities disproportionately live as compared to whites in the City. The complaint alleges that properties in Class One majority-minority neighborhoods are over assessed annually by $1.9 billion and over-taxed annually by $376 million compared to white homeowners in majority-white neighborhoods. TENNY alleges that Class Two properties are similarly taxed at higher rates along racial lines and that the disparities are extreme with some districts taxed at over 275% the rate of other districts and that, because of the demographic differences between the districts, these disparities in tax rates fall heaviest on minorities. The complaint further alleges that higher tax rates increase the cost of housing, in a City with an affordable housing shortage (*see* City of New York, *Housing in New York: A Five-Borough, Ten-Year Plan* [2014] at 5 [observing that "New York City's shortage of affordable housing has reached a crisis point"]; *see also* Oksana Mironova and Samuel Stein, *Our Fast Analysis of the 2021 New York City Housing and Vacancy Survey* at 7 [noting that "most New Yorkers—55 percent, or 1,196,100 households—were rent burdened in 2021," meaning, under federal guidelines, that they paid "rents that exceed[ed] 30 percent of gross household income]). The complaint alleges that the higher tax rates increase foreclosure rates in majority-minority communities and makes it more difficult for minorities to buy, own, maintain, and rent dwellings. Accepting these allegations as true, as we must on a motion to dismiss, the fourteenth cause of action sufficiently alleges an FHA violation (*see Leon*, 84 NY2d at 87).

The complaint also alleges that the City's taxation assessment practices discriminate with respect to the terms and conditions of housing under 42 USC § 3604 (b). As TENNY argues, a property's tax assessment and outstanding tax liability transfers upon sale to the purchaser and thus impacts the price paid—an obvious term of the sale. Similarly, landlords pass tax burdens onto their tenants in the rent charged—an obvious term of the rental (*see* RPTL 304 [2]). This transfer of tax burdens to home buyers and renters, are alleged to be part of a discriminatory practice based on the protected classifications, and thus violates the FHA. Therefore, the fifteenth cause of action also sufficiently alleges an FHA violation.

The Appellate Division erroneously applied a heightened pleading standard to these FHA claims, relying on language from *ICP* (*see* 182 AD3d at 166). However, the Appellate Division overlooked the fact that *ICP* arrived before the United States Supreme Court, not on a motion to dismiss—as here—but following a summary judgment that the plaintiffs "had made a prima facie showing of both intentional discrimination and disparate impact" under the FHA (*Inclusive Communities Project, Inc. v Texas Dept. of Hous. and Community Affairs*, 747 F3d 275, 279 [5th Cir 2014], *affd and remanded*, 576 US 519 [2015]). Judge Garcia's dissent also fails to acknowledge that this difference in procedural postures matters, especially when considered in conjunction with our State's comparatively liberal pleading standards (*see* Garcia, J., dissenting op at 13).

The Supreme Court explained in *ICP* that "a disparate impact claim that relies on a statistical disparity" fails unless the disparity is caused by the defendant's policy (576 US at 542). The Court further explained that "[a] robust causality requirement ensures that mere racial imbalance without more does not establish a plaintiff's disparate impact prima

facie case" (*id.* [internal quotation marks omitted]). As the Supreme Court has made clear, a plaintiff's prima facie burden to show discrimination is an *evidentiary* standard, not a pleading standard (*Swierkiewicz v Sorema N. A.*, 534 US 506, 510 [2002]; *see also Mandala v NTT Data, Inc.*, 975 F3d 202, 208-209 [2d Cir 2020] [confirming that *Swierkiewicz's* holding survived the Supreme Court's subsequent decision in *Ashcroft v Iqbal* (556 US 662, 678 [2009])]). Thus, in *ICP*, the Supreme Court's causation analysis aptly applied that Court's precedents to an evidentiary record generated during discovery (*see Inclusive Communities Project, Inc. v Texas Dept. of Hous. and Community Affairs*, 749 F Supp 2d 486, 499 [ND Tex 2010]). Here, we are at the pleading stage, where we review only the sufficiency—not the ultimate success—of the complaint against defendants' respective motions to dismiss (*see Sassi*, 37 NY3d at 239). The Appellate Division imposed a causation requirement that was ill-suited to the judicial task at hand and inapt at this stage of the litigation, where plaintiff's factual assertions are accepted as true and we need only determine whether the facts fit any cognizable legal theory (*see Leon*, 84 NY2d at 87-88).

Here, the complaint alleges that the City's tax assessment system as a cause of the barriers to housing access, barriers that disparately impact minority homeowners and minority-majority communities with respect to Class One and Class Two properties. As we have discussed, those allegations are sufficiently pleaded.

Finally, the sixteenth cause of action asserts the City's tax system perpetuates existing segregation throughout the city in violation of the FHA, 42 USC § 3604 (a). The FHA's legislative goals are twofold: elimination of discrimination in housing and the

promotion of residential integration (*see Huntington Branch, N.A.A.C.P.*, 844 F2d at 936 ["Congress intended that broad application of the anti-discrimination provisions (of the FHA) would ultimately result in residential integration"], citing *United States v Starrett City Associates*, 840 F2d 1096, 1101 [2d Cir 1988] [same]; *see also ICP*, 576 US at 540 [noting that the FHA endeavors to facilitate governmental housing priorities and policies "without arbitrarily creating discriminatory effects or perpetuating segregation"]). As the Supreme Court has recognized: "disparate impact liability may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping" (*ICP*, 576 US at 540). Thus, intentional conduct or a policy that has a segregative disparate impact based on any of the protected classifications violates the FHA (*see* 42 USC § 3604 [a]), although a party claiming such must provide more than bare statistics (*see ICP*, 576 US at 543).

New York has a longstanding history of housing segregation and remains one of the most segregated cities in the country (*see* Lolly Bowean, *Segregation Declines in Chicago, but City Still Ranks High, Census Data Show*, Chicago Tribune [Jan. 4, 2016], *available at* https://www.chicagotribune.com/news/ct-segregation-declines-neighborhoods-change-met-20160103-story.html [summarizing study concluding, among other things that New York City is the second most segregated city in the United States] [last accessed Jan. 28, 2024]; Stephen Menendian, Samir Gambhir, and Arthur Gailes, *Twenty-First Century Racial Residential Segregation in the United States*, Othering and Belonging Institute at the University of California Berkeley [Jun. 30, 2021] at 19 [observing that New York City is the most segregation metropolitan area in the country]). As TENNY alleges "[b]lacks and whites are the most isolated from other races" as "[v]ast sections of southeast Queens

and central Brooklyn are nearly all black, while parts of Staten Island, the Upper East Side in Manhattan, and Orthodox areas in Brooklyn are nearly all white" (Mireya Navarro, *Segregation Issue Complicates de Blasio's Housing Push*, NY TIMES [Apr 14, 2016]). But, beyond these numbers, TENNY's perpetuation-of-segregation claim alleges that the tax system's disproportionate burdens on renters and majority-minority neighborhoods suppress minority mobility into wealthier, whiter neighborhoods. True, as TENNY acknowledges, individuals choose to live in a neighborhood or move into or out of a community for reasons unrelated to—or despite—high taxes (*see* Jeremy F. Pais, Scott South, and Kyle Crowder, *White Flight Revisited: A Multiethnic Perspective on Neighborhood Out-Migration*, Popul Res Policy Rev [Jun 1, 2009] at 12-14 [study concluding that "whites' aversion toward minority neighbors remain a motivation for their neighborhood out-migration" but also that "a legacy of racial discrimination leaves minorities apprehensive about being among the few minorities in Anglo neighborhoods because of real or perceived hostility"]). The realities may present obstacles for TENNY's perpetuation-of-segregation claim as this case progresses. However, at the pleading stage, we do not consider whether TENNY will eventually establish its cause of action, only whether it has alleged facts that support a legally viable claim (*see Chanko*, 27 NY3d at 52; *EBC I, Inc.*, 5 NY3d at 19). TENNY need not offer allegations defeating every alternative explanation for the suppressed mobility of minority group members in New York City. Thus, under our State's liberal pleading standards, TENNY's allegation that the City's tax system perpetuates segregation suffices (*see Sassi*, 37 NY3d at 239; *Leon*, 84 NY2d at 87-88).

C.

<u>The Remaining Causes of Action Against the City Fail to State Cognizable Claims</u>

The remaining causes of action against the City based on the federal and state constitutions were properly dismissed for failure to state a claim. They are foreclosed by the deferential standard applied to taxation legislation and policy under existing case law.

1.

<u>Federal and State Equal Protection and Due Process</u>

The complaint alleges that the intra class disparities described in the complaint with respect to properties within Class One (third and fourth causes of action) and Class Two (seventh and eight causes of action) constitute federal and state equal protection violations by the City. We conclude that the complaint does not allege a legally cognizable claim under the legal standard advanced by TENNY.

Both the federal and state constitutions forbid the government from denying persons "the equal protection of the laws" (US Const Amend XIV, § 1; NY Const, art I, § 11). The Court has observed that "[t]he Federal and State Constitutions do not prohibit dual tax rates or require that all taxpayers be treated the same" but "only require that those similarly situated by treated uniformly" (*Foss v City of Rochester*, 65 NY2d 247, 256 [1985]). Hence, "[t]axing statutes, like other social and economic legislation that neither classify on the basis of a suspect class nor impair a fundamental right, must be upheld if the challenged classification is rationally related to achievement of a legitimate State purpose" (*Trump v Chu*, 65 NY2d 20, 25 [1985]). The statute "enjoys a presumption of constitutionality" (*id.* [internal quotation marks and citation omitted]). In other words, the legislature may treat

one class of individuals or entities differently from others for tax purposes "unless the difference in treatment is palpably arbitrary or amounts to invidious discrimination" (*id.* [internal quotation marks and citation omitted]). Thus, even at the pleading stage, with all the favorable inferences we must draw from the factual allegations, a plaintiff faces a high hurdle because "[e]ven a 'flagrant unevenness' in application of the tax will not prevent the statute from passing constitutional muster" under equal protection (*Heimbach v State of New York*, 59 NY2d 891, 893 [1983], quoting *Matter of Long Is. Light. Co. v State Tax Commn.*, 45 NY2d 529, 535 [1978]).

As reflected in its briefs, TENNY assumes that our State Constitution's equal protection guarantee restricts the City's taxation scheme no differently than does its federal counterpart. Thus, we analyze the sufficiency of the complaint as limited by TENNY's argument. " '[A] classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the [federal] Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose' " (*Armour v City of Indianapolis, Ind.*, 566 US 673, 680 [2012], quoting *Heller v Doe*, 509 US 312, 319-320 [1993]). In such cases, a taxing scheme does not violate equal protection if " 'there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational' " (*id.* at 681, quoting *Nordlinger v Hahn*, 505 US 1, 11 [1992] [internal citations omitted]). Such a

"plausible reason" exists "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" (*id.*).

The complaint alleges that Article 18 of the RPTL results in inequitable tax burdens between Class One and Class Two properties, and within each of those classes as well. Contrary to TENNY's argument here, there is a rational tax-related purpose for treating dissimilar Class One and Class Two properties differently and for imposing both assessment caps within each class and caps upon the amount by which the class share for each class may increase each year.

As we have recounted in the past and here, Article 18 of the RPTL was enacted in the wake of the Court's holding in *Hellerstein*, a decision that generated concern that there would be a dramatic increase in taxes for homeowners (*see O'Shea*, 8 NY3d at 253-254; *see also supra*, section I). The legislature overrode a gubernatorial veto to enact chapter 1057 of the laws of 1981, which added Article 18, which "despite its imperfections" was viewed as "the only ball game in town to prevent a dramatic shift of real property taxes from business to homeowners, and provide a high degree of stability in the relative tax burdens of these categories of taxpayers" (*id.* at 254-255 [internal quotations and citations omitted]). The new law "was 'designed to maintain the stability of relative property class tax burdens' " (*id.* at 254, quoting Budget Report on Bills, at 1, Bill Jacket, L 1981, ch 1057). Thus, the statutory tax framework was designed to accomplish the tax-related objective of avoiding abrupt increases or shifts in tax liability over time. This is a rational tax-related purpose for the legislature's different treatment of Class One and Class Two properties and imposition of caps under RPTL 1805 (1). Hence, within Class

One, the assessment caps result in differing effects on similarly-situated properties depending on the magnitude of their appreciation in value, but this treatment results from a rational legislative objective of shielding homeowners whose home values rapidly appreciate from unexpectedly high tax burdens (*see Nordlinger*, 505 US at 11-13). Moreover, the distinct treatment of condominiums and cooperatives within Class Two under RPTL 581 has a rational basis as it was intended "to insure that owners of condominiums and cooperatives properties would be taxed fairly compared to rental properties held in single ownership and not penalized because of the type of ownership involved in their multiple dwellings" (*Matter of D.S. Alamo Assoc*, 71 NY2d at 347). Because there are " 'plausible policy reason[s] for the classification[s]' " the complaint fails to allege cognizable equal protection claims based on inter- and intra-class property differences (*Armour*, 566 US at 681, quoting *Nordlinger*, 505 US at 11). The eleventh and twelfth causes of action based on an alleged policy designed to privilege the interests of Class One properties over those of the other three classes--another permutation of the inter class disparities described in the complaint--fare no better. Section 1802 of the RPTL created the four property classes and RPTL 1803 requires that municipalities determine each class's proportion of the total tax burden. The cap on each class share serves the rational legislative objective of maintaining stability within the class and avoiding dramatic shifts in the tax burden. Therefore, the Appellate Division properly dismissed these equal protection claims.

The ninth and tenth causes of action assert federal and state due process violations. The gravamen of those causes of action is that all properties must be taxed equally based

on their market value, regardless of whether the property is residential, commercial, industrial, or the form in which it is held (cooperative, condominium or fee simple). These too were properly dismissed. Both the federal and state constitutions forbid the government from "depriv[ing] . . . any person of life, liberty, or property without due process of law" (US Const, amend XVI; NY Const art I, § 6). The Court has explained that "[m]easures enacted in the exercise of the taxing power for the purpose of raising revenues violate the due process clause 'only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power" (*Ames v Volkswagen, Ltd. v State Tax Commn.*, 47 NY2d 345, 348-349 [1979], quoting *Mangano Co. v Hamilton*, 292 US 40, 44 [1934]). In other words, "[t]he Legislature has nearly unconstrained authority in the design of taxing measures unless they are utterly unreasonable or arbitrary" (*Ames*, 47 NY2d at 349). The City's property tax scheme is consistent with these principles; differentiating the tax burden among the several different property types does not fail the rational basis test applicable to due process claims.

2.

Article XVI, § 2 of the State Constitution

The complaint alleges violations of Article XVI § 2 of the State Constitution in its first cause of action relating to disparities within Class One and in the fifth cause of action relating to disparities within Class Two. Both were properly dismissed.

Article XVI, § 2 provides that "[t]he legislature shall provide for the supervision, review and equalization of assessments for purposes of taxation" (NY Const art XVI, § 2).

Article XVI, § 2 requires fair processes for reviewing assessments to ensure "that each assessing unit bears its proportionate share" (*Foss*, 65 NY2d at 255). It does not require substantive equality of assessments between different classes.

TENNY argues that this constitutional provision imposes a substantive requirement that all properties within each class be assessed at the same percentage of their market value and relies on the Court's decision in *Foss v City of Rochester* (65 NY2d 247 [1985]). This reliance is misplaced. Article XVI § 2 imposes a duty on the legislature only, not the City. That obligation is to "provide for the supervision, review and equalization of assessments for purposes of taxation." The legislature has provided such a system and, as discussed herein, RPTL 305 (2) and 1805 pose no obstacle to the City's equalization of taxes. We see nothing in the State's statutory scheme that constitutes a violation of Article XVI § 2.

Finally, although the complaint alleges an RPTL 1802 (1) cause of action claiming that the City has, in practice, created subclasses based on improper factors, TENNY has not briefed to us any argument in support of that claim or otherwise referenced its arguments below. Regardless, we conclude that the Appellate Division properly dismissed this cause of action because the complaint fails to sufficiently plead that the alleged nonuniform assessments constitute discreet, identifiable, impermissible subclasses rather than rationally-based differential tax treatment within the existing four classes.

## D.

## Claims Against the State Defendants

The complaint alleges all of the same constitutional federal and state violations and FHA claims against the State that it alleged against the City. We easily dispose of these claims because the gravamen of the complaint is a challenge to the City's real property tax scheme and, by so focusing, fails to separately explain why the State is liable for the City's methodological choices, including the City's failure to cure the inter- and intra- property class inequities. This failure in the pleading is fatal.

## IV.

## Conclusion

TENNY's complaint describes in detail the City's real property tax system and, with similar particularity, alleges that the system is unfair, illegal, and ever more inequitable with each passing year. The City and State do not dispute that the system results in disparities. The complaint recounts acknowledgements from City officials that these rampant disparities lead to inequality among similarly-situated property owners. While these officials bemoan the situation, the City fails to act. According to the complaint, the numbers tell the story of a taxation scheme that requires lower-income property owners and renters in majority-minority New York City neighborhoods to pay more than their fair share of the tax burden in violation of the law. TENNY contends that it sufficiently pleads

that the law requires defendants to mitigate the existing disparities. We agree with TENNY in part.

We conclude that the complaint sufficiently pleads causes of action against the City for violations of RPTL 305 (2) and the FHA with respect to Class One and Class Two properties. The remaining causes of action against the City and all the claims against the State fail to plead constitutional and statutory violations for the reasons we have discussed.

Accordingly, the Appellate Division's order should be modified, with costs awarded only to respondent State of New York, in accordance with this opinion and, as so modified, affirmed.

GARCIA, J. (dissenting in part):

Tax Equity Now NY LLC ("TENNY"), an "association committed to pursuing legal and political reform to address the inequity and illegality of New York City's property tax system," asks this Court to remedy "staggering" inequities that allegedly result from the

City's tax assessment regime, turning to the courts because "calls for political reform over the last three decades have fallen on deaf ears [and] elected officials have deemed the political costs of fixing the City's broken property tax system too high." Frustrated with the political process, TENNY brings a myriad of claims against New York City and State, ranging from alleged violations of the equal protection and due process clauses of the New York State and Federal Constitutions to violations of the federal Fair Housing Act.

The gravamen of TENNY's complaint is that the New York State property tax system, as enacted and applied by City and State entities, "violates state and federal constitutional and statutory mandates that require that property taxes be imposed uniformly within each property class and reflect a fair and realistic value of the property involved" (*Tax Equity Now NY LLC v City of New York*, 182 AD3d 148, 154 [1st Dept 2020]). My colleagues in the majority hold that these allegations "exceed[] our pleading standard . . . on the general basis that the system is unfair, inequitable and has a discriminatory disparate impact" (majority op at 2). I disagree with that misrepresentation of what the standard requires. At a more serious level, the majority's approach misapprehends the relevant RPTL provisions, our precedent applying them, and the pleading requirements of a claim under the FHA. A review of the complaint against the plain language of these statutes, even construing the pleadings liberally and granting TENNY all favorable inferences as we must, shows that the complaint falls well short of alleging any cognizable legal theories of statutory violations. As a result, I agree with the Appellate Division that

all claims against the City and State should be dismissed (182 AD3d 148 [1st Dept 2020])

and I dissent.[1]

RPTL 305 (2) Claims

TENNY alleges that the City's assessment process violates RPTL section 305 (2)

in two ways, as discussed in more detail below. The majority's endorsement of these

theories requires a misreading of the statutory language and our precedent; chiefly, a

flawed understanding of the statute as *requiring* the city to provide equal tax treatment for

all properties of equal market value. The statute requires no such thing.

While the majority claims to find support in the "text, legislative history and this

Court's precedent" (majority op at 14), the opinion ignores the first two and misinterprets

or misunderstands the case it primarily relies upon. As to the text, RPTL 305 (2) provides

that "[a]ll real property in each assessing unit shall be assessed at a uniform percentage of

value (fractional assessment)." The issue here is the meaning of "assessed at a uniform

percentage of value" or "fractional assessment." The majority interprets these terms to

mean "assessed value after certain caps are applied." This is incorrect, as a review of the

taxing scheme, the legislative history, and the same precedent relied on by the majority

makes clear (*see Matter of O'Shea v Board of Assessors of Nassau County*, 8 NY3d 249

[2007]). Instead, those terms refer to the fractional assessment obtained by applying the

target assessment rate to a property's market value.

---

[1] I agree in result with the majority's dismissal of TENNY's state and federal constitutional
claims for reasons stated by the Appellate Division (182 AD3d at 157-168).

In New York City, the Department of Finance "assesses the taxable value of a parcel of real property by multiplying its market value by the fractional assessment rate applied to that parcel's property class, with Class One properties assessed at 6% of their market value and all other classes of property assessed at 45% of their market value" (182 AD3d at 155-156). Once that uniform percentage has been applied to market value and a fractional assessment determined, certain "caps" come into play. Most relevant here is the cap specified in RPTL 1805, which provides that "[t]he assessor . . . shall not increase the assessment of any individual parcel classified in class one in any one year . . . by more than six percent" and "shall not increase such assessment by more than twenty percent in any five-year period;" for Class Two properties, no assessment shall be increased by more than eight percent in one year and 30 percent in any five-year period. Application of this cap structure is the basis for TENNY's first claim under section 305 (2).

According to TENNY, with respect to Class One properties, "the City taxes different parcels of real property within the Class at wildly different percentages of value" through its "application of assessment caps" and "[t]he City could avoid or minimize these disparities, while still applying assessment caps required by state law, by lowering Class One's assessment ratio." The majority accepts these allegations as sufficient to survive a motion to dismiss, in part because "the RPTL authorizes the City to avoid these disparities" (majority op at 19). While requiring equal tax treatment for all properties of equal market value is a laudable goal, and the City is certainly *permitted* to take the action demanded, the statute does not require the City to do so. The only issue under section 305 (2) is whether the City assesses property at a uniform percentage of market value. It does.

The charts below are useful in identifying what is—and what is not—relevant to our analysis of a section 305 (2) claim. That section requires that property be "*assessed* at a uniform percentage of value" using fractional assessment (emphasis added). Column IV, depicting the "fractional assessment," is therefore the reference point for statutory compliance. As the charts demonstrate, the City follows the mandated approach— fractional assessments are calculated at a uniform 6% rate for Class One properties (Column III), producing the corresponding "fractional assessment" in Column IV. Disparities only come into play when the caps required by RPTL 1805 are applied. But the application of these caps does not affect the uniformity of the fractional assessment. The assessment is calculated at a uniform percentage of market value—then the section 1805 assessment caps, and a myriad of other policies that may reduce a particular tax bill, are applied (Column V).

**Year 1**

| I. Property | II. Market Value | III. Target Assessment Ratio | IV. Fractional Assessment | V. Capped Assessment (6%) | VI. Actual Assessment Ratio |
|---|---|---|---|---|---|
| A | $100,000 | 6% | $6000 | $6000 | 6% |
| B | $100,000 | 6% | $6000 | $6000 | 6% |

**Year 2**

| I. | II. | III. | IV. | V. | VI. |
|---|---|---|---|---|---|
| Property | Market Value | Target Assessment Ratio | Fractional Assessment | Capped Assessment (6%) | Actual Assessment Ratio |
| A | $115,000 | 6% | $6900 | $6360 | 5.53% |
| B | $106,000 | 6% | $6360 | $6360 | 6% |

The majority's error is clear. Rather than use the "fractional assessment" column referred to in RPTL 305 (2), the majority appears to use some combination of "Capped Assessment" and "Actual Assessment Ratio" in finding the allegations that the City violated the statute sufficiently alleged (majority op at 15-21). This interpretation finds no support in the plain language of the statute and is flatly contradicted by our caselaw and the legislative history.

The majority rests its erroneous interpretation of the statute on a misreading of our holding in *Matter of O'Shea*. To the contrary, in *O'Shea* this Court made clear that the process represented by Columns III and IV above is the proper reference point for compliance with section 305 (2) (8 NY3d 249). In that case, the petitioners, owners of real property in Nassau County, challenged an assessment, conducted pursuant to a court-approved stipulation, that saw the assessed market value of their homes soar, asserting that the assessment violated the cap structure of section 1805 (1) (*id*. at 252). The petitioners argued that "assessment" meant "full valuation or full market value or appraised market

value, not fractional assessment" (*id*. at 259) so that the caps of section 1805 would essentially apply to Column II above.

As provided in the stipulation, the County was obliged to "assess all Class I residential property in [the County] at a uniform percentage of value (fractional assessment) such that the uniform application of such fractional assessment rate does not result in any assessment for any individual parcel of Class I residential property that would require the application of RPTL 1805 to limit any assessment" (*id*. at 257). Given that applying even a 1% target assessment ratio would not meet that goal, the settlement acknowledged that .5% of the fractional assessments could nevertheless be subject to the section 1805 (1) caps (*id*.). The language used in the stipulation—"uniform percentage of value (fractional assessment)"—tracks the exact phrasing of section 305 (2) and makes clear that the reference point is columns III and IV, that is, the columns prior to the application of the caps. This Court used the same terminology in analyzing the issues, noting that only 0.47 % of the "assessed values" required the imposition of the section 1805 caps (*id*. at 258). Rather than focus on the clear import of the analysis, that section 305 (2) refers to the application of the assessment ratio and resulting assessed value *prior to* imposition of the caps, the majority takes *O'Shea* as support for its position that the statute references post-cap assessment value (*see* majority op at 15-17). Nothing makes the error of that position clearer than the fact that, under the majority's interpretation of section 305 (2), the settlement in *O'Shea* would be unlawful because nearly .5 percent of the properties had "actual assessment ratios" lower than the others in the class. The majority attempts to

justify its interpretation of the statute based on a holding that would itself have permitted a violation of that interpretation.

Moreover, the majority extrapolates a statutory mandate for reduced assessment rates from a case that considered only whether the reduced assessment rates required by a settlement provision violated the caps imposed by section 1805 (1).  Although this Court held that the County could lower the fractional assessment rate (in that case to 1 percent of value) to the point of *almost* eliminating the effect of the cap without violating section 1805, there is nothing in *O'Shea* suggesting that section 305 (2) mandates such an approach.  Section 305 (2) goes unaddressed and unchallenged in both *O'Shea* and in the complaint that led to the settlement discussed there.  For good reason:  the case involved only the effect of the assessment procedure implemented pursuant to the stipulation on the statutory assessment caps, not whether the County had a statutory duty to adopt that procedure.[2]

Similarly, that "there are no textual limitations on changes to the fractional assessment rate" (majority op at 16) does not bear on what section 305 (2) requires.  It is this repeated error—confusing what the City may do with what the City must do—that underlies the majority's analysis (see majority op at 17 ["*O'Shea* makes clear that the RPTL does not limit the City's authority to take action . . . to achieve an alignment between

_____

[2] The stipulation in *O'Shea* that required lowering the fractional assessment rate to eliminate the effect of the section 1805 caps for 99.5 percent of assessed homes was to expire after a minimum of three years and a maximum of six.  The majority's mandate, which will also apply to assessments done in Nassau County (*see* RPTL1801 [a]), has no sunset.

assessed and market values that ameliorates disparate tax burdens"]; majority op at 19 ["the RPTL authorizes the City to avoid these disparities"]; *see O'Shea*, 8 NY3d at 259 [1805 (1) not intended to "hamstring a special assessment unit from curing inequities"]). Certainly, the City could do what TENNY demands it do, but section 305 (2) does not, unlike the stipulation in *O'Shea*, require it to do so.[3]

In addition to misunderstanding *O'Shea*'s impact on the issues here, the majority ignores the relevant legislative history of the statute. In support of its interpretation, the majority states that the "statutory framework was intended to avoid spikes in property taxes due to shifts from business to homeowners" (majority op at 20). While the legislation was "principally aimed at protecting taxpayers from tax increases caused by tax shifts from business to homeowners" (*O'Shea*, 8 NY3d at 262), opponents wanted it to do more. That is, they wanted it to do what TENNY now claims it does.

The legislature enacted Article 18 of the RPTL over the governor's veto. TENNY itself explains this opposition in its complaint, describing how "when the present system was proposed, it was denounced by the State Board of Equalization and Assessment . . . as a 'dangerous piece of legislation' that violated guarantees of equal protection and due

---

[3] The majority mischaracterizes the dissent in *O'Shea* in attempting to dismiss the argument here as previously rejected by this Court (*see* majority op at 19-20). The dissent in *O'Shea* asserted that the assessment referenced in section 1805 (1) required that the "percentage used to determine the fractional assessment" must be "held constant from year to year" to effectuate the purpose of that law (8 NY3d at 262 [Smith, J., dissenting]). Of course, as *O'Shea* held and as noted above, the City is not *barred* by section 1805 from taking the action demanded of it—lowering the percentage used—but again, that point is irrelevant to whether the statute requires it to do so and the *O'Shea* dissent is therefore irrelevant to the position taken here.

process and would 'institutionalize discriminatory assessment practices against all property owners' " and "[i]ts rejection was likewise urged by the sitting Governor, then Lieutenant Governor Mario Cuomo, the State Comptroller, the New York State Association of Counties, the New York Conference of Mayors and Municipal Officials, the New York AFL-CIO, the League of Women Voters of New York State, the Citizens Budget Commission, and others."  The governor's veto and the widespread opposition to the legislation was driven by the prevailing view that the legislation did nothing to fix the existing inequities in the system and instead raised constitutional issues.  Indeed, detractors argued that the legislation  "raises both constitutional and equal rights issues" (Letter from Chairperson of the New York State Association of Counties, Conference of Mayors, Association of Towns, School Boards Association, Assessors Association, and Association of County Directors of Real Property Tax Services, Bill Jacket, L 1981, ch 1057) and complained that "this bill does not provide the real property tax reform necessary to increase equity within the existing system," in part because "[t]hose property owners whose assessments are unfairly high because of outdated assessment practices would continue to shoulder a disproportionate share of the tax burden" (*see* Division of the Budget Recommendation, Bill Jacket L 1981, ch 1057, at 3).  Specifically, critics pointed to section 305 (2) as "allow[ing] similar properties to be assigned different tax rates on the basis of their location" and failing to "address the question of equal assessment" (Letter from the President of the Real Estate Board of New York, Bill Jacket L 1981, ch 1057, at 1).  The bill's opponents also criticized the fact that the bill failed to provide an established method for measuring actual property value (*see* Division of the Budget Recommendation, Bill

Jacket L 1981, ch 1057, at 71 ["Although this bill requires property to be assessed at a uniform percentage of value, it does not specify the standard to be used in measuring actual property value. Given the absence of a clear standard of value, local assessors could have wide discretion in determining the value of properties against which the uniform fractional assessment will be applied. This could perpetuate the inequitable practice of assessing comparable property at different values and ultimately lead to court challenges by taxpayers claiming denial of equal protection under the law"]).

Criticism was also lodged at RPTL 581, another provision TENNY challenges which relates to the method of assessing cooperatives and condominiums. The bill's opponents argued that the animating purpose behind that section "compels assessors to assess such property in a certain manner which is established by statute, even though it may have a market value or other value which is in fact greater," a result which they argued would be "repugnant to the concept of a fair assessment procedure" (Letter from the General Counsel, NY Conference of Mayors and Municipal Officials, Bill Jacket L 1981, ch 1057, at 2). Others suggested that the legislation "virtually guarantees that the purchaser of a co-op will pay lower taxes than the purchaser of a single-family house with the same price" (Letter from Dick Netzer, Dean of the NYU Graduate School of Public Administration, Bill Jacket L 1981, ch 1057, at 3). The legislature overrode the governor's veto and passed the legislation, despite the criticism of the proposed system as at best ineffective and at worst unfair (*see* 8 NY3d at 254-255).

In sum, as the legislative history makes clear, the statute was not designed to do what the majority demands of it. What section 305 (2) requires is that property be "assessed at a uniform percentage of value (fractional assessment)." That is done under the City's current approach. A uniform percentage is applied, a consistent fractional assessment obtained, and then the caps, if applicable, are triggered. Certainly, as *O'Shea* holds, the City is permitted to implement this statutorily mandated process in a manner that would, as TENNY asserts, cause disparities to "vanish"—but the failure to do so is not a violation of the statute. The remedy for resulting unequal tax burdens is not for this Court to decide 40 years later that the statute now does what it was universally criticized for failing to do, but for elected officials to revisit the statute if they choose.

The majority's holding will also have the effect of eliminating any and all assessment caps. Under the majority's new rule, compliance with section 305 (2) is only possible by applying a target assessment ratio low enough to make the caps vanish—that is, to make all assessment ratios equal. That, of course, is not what is required and was never the understanding of section 305 (2) (*see e.g.* Letter from Legal Counsel, Division of Veterans' Affairs, Bill Jacket L 1981, ch 1057 [portraying section 305 (2) as favorably affecting veterans because the effect of the prior law, which "mandat[ed] full value assessment, ha[d] diluted veterans tax exemptions"]). The policy considerations underlying any caps are now written out of New York law.

With respect to Class Two properties, TENNY's complaint alleges that, in addition to inequality arising out of the application of assessment caps, "the City's property tax system provides for 'radically different tax treatment of equally valuable properties,

depending on the use of the property and the form in which it is owned' " because the City "refuses to tax cooperatives or condominiums based on their actual market value." This claim is based on a similarly flawed interpretation of section 305 (2), namely a disagreement with the City's method of assessing the market value of these properties. TENNY's complaint alleges that the City's application of RPTL 581 leads to taxation that is not reflective of "the actual market value of cooperatives and condominiums." But RPTL section 305 (2) does not speak to market values and, of course, cannot be read to mandate equality of market value determinations.[4] The legislative history discussed above shows that section 581 was expected to result in a skewed determination of market values and was criticized for failing to remedy that issue. Once again, the majority seeks to eliminate perceived disparities by "interpreting" section 305 (2) to accomplish exactly what those who opposed the legislation's passage warned that it did not do.

Given the majority's approach, it is no surprise that the holding contains no analysis of either the statute or the complaint's allegations of a violation. Instead, the majority focuses on how TENNY has suggested a solution that would "achieve an alignment between assessed and market values that ameliorates disparate tax burdens" (majority op at 17; *see also* majority op at 20 ["It is possible to both prevent . . . an unanticipated large increase in . . . (a taxpayer's) tax bill . . . while also accounting for increases in market values within the same class by adjusting the City's fractional assessment rate"]). Perhaps

---

[4] Ironically, both the petitioners and the dissent in *O'Shea* argued that "assessment" in this context could be interpreted as "market value" or "assessed value," rather than "fractional assessment" (8 NY3d at 259, 261-262).

it would.  But TENNY's suggestion that it has a better way of doing things is irrelevant to the validity of the cause of action.  That policy argument is again for the legislature.

While a correct reading of section 305 (2) may seem ill-designed to provide any individual relief to the taxpayer, that is because it was never intended to do so.  It set forth a mechanism for assessment.  And although unaddressed by any party, I note that neither of the relevant RPTL provisions provide for a private right of action, and the only review process set out in the statute is for the review of individual assessments under RPTL 524 and article 7 tax certiorari proceedings (*see e.g. Matter of School Transparency Org. for Parents v Harpursville Cent. Sch. Dist.*, 50 Misc 3d 478, 487 [Sup Ct, Broome County 2015] [granting motion to dismiss where complaint alleged violation of RPTL 1318 because no private right of action for a violation of that statutory provision exists]).  The recognized procedural device for challenging "not [plaintiffs'] individual tax assessments, but rather the method by which those assessments are calculated . . . [is] a CPLR article 78 proceeding," pursuant to which the City's policies would be reviewed under an arbitrary and capricious standard (*Matter of Adams v Welch*, 188 AD2d 784, 786 [3d Dept 1992] [citing cases]).  Because, as the majority acknowledges in its dismissal of TENNY's equal protection and due process claims (majority op at 31-35), the challenged statute and the City's application of them serve rational legislative objectives, no such claim could survive.  This flaw in TENNY's complaint explains the obvious disconnect in the majority's analysis.  And not only do we allow such a claim to be brought here, but we uphold it based on an erroneous reading of the statute and our precedent.  Moreover, as there is no way to comply with the majority's new rule other than by lowering the target

assessment ratio to a fraction so low that all caps are eliminated, the majority has essentially ordered the City to do so.  To define a violation as the majority does is to find a violation.

Fair Housing Act

I would affirm the Appellate Division's order dismissing TENNY's FHA claims.

"[A] plaintiff bringing a disparate-impact claim [under the FHA] challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale" (*Texas Dept. of Hous. and Community Affairs v Inclusive Communities Project, Inc.*, 576 US 519, 524 [2015] [*ICP*], quoting *Ricci v De Stefano*, 557 US 557, 577 [2009]).  Allegations of a causal connection between such practices and the alleged adverse effect are a requirement of all FHA claims.  The majority relies on the US Supreme Court's holding in *ICP* to permit TENNY's claims to proceed without such a connection, but misconstrues both the procedural nature and substance of this holding.  While the Supreme Court received *ICP* following a bench trial, that Court granted certiorari to answer "the question whether disparate-impact claims are cognizable under the FHA"— a question that inherently speaks to the pleading stage (*id.* at 525).  And in holding that such claims are cognizable, the Court addressed the appropriate pleading standard, explaining that "a disparate-impact *claim* that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity" and a "plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact" (*id.* at 542-543 [emphasis added]).

Rather than improperly imposing a prima facie requirement at the pleading stage, this language explains that, because failings at the pleading stage lead inexorably to a failing at later procedural stages, courts must "examine with care" allegations of disparate impact with a focus on "prompt resolution" (*id.* at 543; *see also id.* at 544 ["Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities"]). Confirming that "[r]ecognition of disparate-impact claims is consistent with the FHA's central purpose," the Supreme Court noted the importance of limiting disparate impact liability "in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based solely on a showing of a statistical disparity" because "[t]he FHA is not an instrument to force housing authorities to reorder their priorities" (*id.* at 539-540).

The majority ignores TENNY's failure to allege the required connection between the tax policies it challenges and higher tax rates in majority-minority communities. The complaint shows that there is a "higher likelihood that a majority-white district will comprise properties that have experienced more rapid and substantial appreciation, as compared to a majority-minority district," that "[w]hile more than 64% of renters are racial minorities, only a little more than 40% of condominium owners and 33% of cooperative owners are racial minorities," and that the tax system "exacerbat[es] the financial burden imposed upon [minority-majority neighborhoods] and constrain[s] household mobility." TENNY fails to allege, however, that the policies it challenges have caused these disparities. As the Appellate Division explained, TENNY "failed to allege sufficient

concrete facts or produce statistical evidence showing that the application of the property tax system, as opposed to other factors, causes financial barriers that inhibit the ability of minority residents to own homes" or "sufficient concrete facts or . . . statistical evidence showing how the current property tax system contributes to higher rates of foreclosure or discourages the production of rental units in majority-minority communities" (182 AD3d at 167). Moreover, with respect to the perpetuation of segregation claim, the Appellate Division properly deemed "without basis" TENNY's "assumption that New York City residents would elect to relocate to other neighborhoods if defendants applied the property tax system differently" (*id.*). The mere identification of higher tax rates in particular neighborhoods does not state a claim for disparate impact liability under the FHA (*see e.g. Moody v Related Companies, LP*, 620 F Supp 3d 51, 57-58 [SD NY 2022] ["Plaintiffs have alleged no facts from which the Court can infer that . . . race-neutral housing policies have a disproportionate impact on any particular racial or ethnic group" because "different outcomes based on wealth do not provide a basis for an FHA claim"]). Without a showing of more than "bare statistics" (majority op at 29), TENNY's FHA claims fail to meet the pleading requirements established in *ICP*.

* * *

As the Supreme Court has noted, in the context of constitutional challenges to state tax policy, "[t]he broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized [and] [t]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed

by a legislature in formulating sound tax policies" (*Regan v Taxation With Representation of Washington*, 461 U.S. 540, 547 [1983], quoting *Madden v Kentucky,* 309 U.S. 83, 87-88 [1940]; *see Matter of the Association of the Bar of the City of New York v Lewisohn*, 34 NY2d 143, 156 [1974] ["The State has great freedom in selecting the subjects of taxation and in granting exemptions and neither the due process clause nor the equal protection clause imposes any rigid limitations upon the State's power to devise reasonable tax policies."]).  Inequalities in the effect of tax policy raise serious issues and resolution of those issues will have far-reaching consequences.  The majority removes the debate over tax policy and reform from its proper forum and eliminates existing policy choices enacted through that democratic process.  Instead of all interested stakeholders participating through their elected representatives in an effort to balance competing interests, our new rule virtually guarantees that the parties here will craft new tax policy in a settlement conference room—a result all the more disturbing as it flows from our own error of law.  I dissent.

CANNATARO, J. (dissenting in part):

I agree with the majority as to the pleading standard to be applied to claims under the federal Fair Housing Act (FHA) (42 USC § 3601 *et seq.*) and the conclusion that plaintiff sufficiently pleaded its causes of action under that standard. At the pleading stage,

- 1 -

those allegations are legally sufficient to state a claim that the City's property tax policies disparately impact minority groups. I further agree with the majority's dismissal of plaintiff's federal and state constitutional claims.

However, I cannot join the majority's holding with respect to plaintiff's claims arising under RPTL 305 (2). I agree with Judge Garcia's partial dissent that the majority's analysis of the interplay between RPTL 305 (2) and related assessment cap provisions essentially reads the statutory caps out of existence, and that flaws in the tax scheme, if any, should be addressed through the legislative process. In addition, the majority opinion strongly suggests, if not outright holds, that there is a singular remedy required for the alleged RPTL violations. In my view, it is neither necessary nor appropriate to go that far in the context of a CPLR 3211 (a) (7) motion to dismiss. Thus, with respect to the remaining, non-FHA causes of action, I agree that they should be dismissed for failing to state a cause of action, largely for the reasons stated in Judge Garcia's partial dissent.

Order modified, with costs awarded only to respondent State of New York, in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Rivera. Chief Judge Wilson and Judges Troutman and Halligan concur. Judge Garcia dissents in part in an opinion, in which Judge Singas concurs. Judge Cannataro dissents in part in a separate dissenting opinion.

Decided March 19, 2024